No. 96,463

CENTRAL NATURAL RESOURCES, INC., *Appellant*, v. DAVIS
OPERATING COMPANY, *et al.*, *Appellees*.

(201 P.3d 680)

Opinion filed
February 6, 2009.

*Timothy E. McKee*, of Triplett, Woolf & Garretson, LLC, of Wichita, argued the cause, and *Paula D. Langworthy*, of the same firm, *David E. Pierce*, of Topeka, and *Richard G. Tucker*, of Tucker and Markham, of Parsons, were with him on the briefs for appellant.

*Charles R. Willing*, of Fellers, Snider, Blankenship, Bailey & Tippens, P.C., of Tulsa, Oklahoma, argued the cause, and *Steven J. Adams*, of the same firm, and *Edward W. Dosh*, of Parsons, were with him on the brief for appellees Davis Operating Company, *et al.*

*David E. Bengtson*, of Stinson, Morrison, Hecker LLP, of Wichita, argued the cause and was on the brief for appellee Quest Cherokee, L.L.C.

The opinion of the court was delivered by

JOHNSON, J.: Central Natural Resources, Inc. (Central) appeals the district court's order denying its motion for partial summary judgment and granting the defendants' summary judgment motions in a quiet title action to determine ownership of methane gas in the coal formations of 16 tracts of Labette County land. Agreeing with the district court's determination that the warranty deeds conveying the coal to Central's predecessor in title did not convey the methane gas contained within the coal, we affirm.

## FACTUAL OVERVIEW

During a period from 1924 through 1926, Central's predecessors in interest paid money to the owners of 16 separate tracts of land in Labette County, Kansas; in return for coal warranty deeds. All of the deeds recited that the landowners were conveying "all coal without reference to quality or quantity, . . . together with the right to mine and remove same." The deed to one of the tracts, identified in this lawsuit as tract 12, contains a specific reservation, which recited that "it being further agreed that all rights, surface, mineral or otherwise not specifically granted herein are hereby reserved by first parties . . . together with the right to remove the same if other minerals are found." Other differences in deed language are not germane to this opinion.

Neither Central nor any of its predecessors in title have ever exercised the right to mine and remove coal from any of the tracts. Likewise, Central has never attempted to explore for or produce the natural gas that resides within the seam of coal underlying the subject land, known as coalbed methane gas (CBM).

Three-quarters of a century after the coal transfers, the defendant oil and gas companies obtained oil and gas leases on some of the tracts. Pursuant to those leases, certain defendant companies

drilled for and obtained production of CBM. Thereafter, Central filed a quiet title action, claiming ownership of the CBM in all 16 tracts through the 1924-26 coal deeds, and seeking damages for trespass and conversion for the drilling and production activities.

Counterclaims and third-party petitions were filed. The district court bifurcated the action for purposes of dispositive motions and trial, first addressing the CBM ownership issue, and then, if necessary, the court would proceed to determine and resolve all remaining issues in the case. Central moved for partial summary judgment, and various defendants moved for summary judgment. Central was permitted to amend its petition.

Subsequently, the district court issued a memorandum decision and order, granting summary judgment to the defendants on the issue of CBM ownership, *i.e.*, finding that the deeds conveying "all coal" to Central's predecessors in title did not transfer ownership of the CBM. However, the court clarified that its order was not intended to address the plaintiff's claim for trespass or for damages to the coalbed inflicted by defendants in the process of extracting CBM.

The district court also found that the CBM ownership issue was one of first impression, involving a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal pursuant to K.S.A. 2008 Supp. 60-2102(c) could materially advance the ultimate determination of the litigation. The Court of Appeals denied the interlocutory appeal. Upon a petition for review to this court, we granted Central's motion to docket the civil interlocutory appeal directly with the Kansas Supreme Court.

*COALBED METHANE GAS*

Central's arguments rely in part on the physical properties of CBM. It stresses that CBM is created during the natural process by which coal is formed. In *Amoco Production Co. v. Southern Ute Tribe*, 526 U.S. 865, 872-73, 144 L. Ed. 2d 22, 119 S. Ct. 1719 (1999), the United States Supreme Court explained that process as follows:

"We begin our discussion as the parties did, with a brief overview of the chemistry and composition of coal. Coal is a heterogeneous, noncrystalline sedimentary rock composed primarily of carbonaceous materials. See, *e.g.,* Gorbaty & Larsen, Coal Structure and Reactivity, in 3 Encyclopedia of Physical Science and Technology 437 (R. Meyers ed. 2d ed. 1992). It is formed over millions of years from decaying plant material that settles on the bottom of swamps and is converted by microbiological processes into peat. D. Van Krevelen, Coal 90 (3d ed. 1993). Over time, the resulting peat beds are buried by sedimentary deposits. As the beds sink deeper and deeper into the earth's crust, the peat is transformed by chemical reactions which increase the carbon content of the fossilized plant material. The process in which peat transforms into coal is referred to as coalification.

"The coalification process generates methane and other gases. R. Rogers, Coalbed Methane: Principles and Practice 148 (1994). Because coal is porous, some of that gas is retained in the coal. CBM gas exists in the coal in three basic states: as free gas; as gas dissolved in the water in coal; and as gas 'adsorped' on the solid surface of the coal, that is, held to the surface by weak forces called van der Waals forces. These are the same three states or conditions in which gas is stored in other rock formations. Because of the large surface area of coal pores, however, a much higher proportion of the gas is adsorped on the surface of coal than is adsorped in other rock. When pressure on the coalbed is decreased, the gas in the coal formation escapes. As a result, CBM gas is released from coal as the coal is mined and brought to the surface."

Central further urges us to consider the historical context in which the coal deeds were executed. At that time, the parties would have been well aware that coal contained a gas, sometimes referred to as "marsh gas" or "fire damp," which posed a significant danger of explosion as the coal was being mined. *Cf. Amoco,* 526 U.S. at 875-76 (in 1909-10, CBM considered a dangerous waste product of coal mining which frequently sparked explosions). Statutes and regulations of the time placed a duty upon the owner/operator of a coal mine to provide for the safety of miners, including the proper control or ventilation of the CBM. *Cf. Amoco,* 526 U.S. at 876 (federal coal mine safety law of 1891 prescribed specific ventilation standards for coal mines of a certain depth to dilute and render harmless the noxious or poisonous gases).

Therefore, the context within which the coal deeds were executed was that CBM was a dangerous substance which had no economic value, but which, to the contrary, placed an additional burden and expense on the coal mine owner/operator to insure their miners' safety. Moreover, as Central conceded at oral argu-

ment, the parties could not have been privy to the current scientific knowledge as to the manner in which CBM is adsorbed within the coal and, accordingly, would have considered the CBM to be a gas that was separate and distinct from the solid coal.

*APPELLANT'S ISSUES ON APPEAL*

The seemingly straightforward issue presented is whether the 1924-26 deeds, conveying "all coal . . . together with the right to mine and remove same," should be interpreted as also transferring ownership of the methane gas contained within the coal formation. However, Central's brief sets forth five issues.

First, Central queries "[w]hether the 1924, 1925, and 1926 warranty deeds entered into by the Defendants' predecessors in title conveyed to Plaintiff, as grantee of the entire coal estate, the methane gas within the coal." Central answers that question by arguing for our adoption of a "first severance rule," coupled with the application of the "container theory," to find, as a matter of law, that when coal is the first mineral resource severed from the fee and there is no reservation upon that initial severing conveyance, the grantee would thereafter own all and everything which is contained within the coal formation.

Central's second issue is "[w]hether K.S.A. 58-2202 operates to convey all the estate of the grantors in the granted coal, including methane gas, where the grantors in the warranty deeds failed to expressly except rights to methane gas contained within the granted coal." When the coal deeds were executed, essentially the same language now found in K.S.A. 58-2202 was set forth in R.S. 1923, 67-202, which provided:

"The term 'heirs,' or other words of inheritance, shall not be necessary to create or convey an estate in fee simple; and every conveyance of real estate shall pass all the estate of the grantor therein, unless the intent to pass a less estate shall expressly appear or be necessarily implied in the terms of the grant." R.S. 1923, 67-202.

Central contends that the statute requires that the CBM, which is physically intertwined with the coal, will automatically pass with a conveyance of the coal, unless an intent to reserve or except the

CBM expressly appears in or can be necessarily implied from the terms of the coal deed.

The next issue presented is "[w]hether the warranty deeds should be interpreted to give each deed the meaning a reasonable person would give the deed at the time of the conveyance." Central argues that we have a legal duty to ascribe a meaning to a document that is consistent with the parties' intent at the time the contract was made. To do that, Central lobbies for the court to employ a reasonably intelligent person standard and to permit extrinsic evidence as to the circumstances and conditions under which the contract was made, even if the instrument is unambiguous, in order to place the language of the instrument in the proper context.

Similarly, Central's fourth issue is "[w]hether the warranty deeds must be interpreted in light of their historical context with the goal of ascertaining the objective intent of the parties in 1924, 1925, and 1926 when the conveyances were made." Central reiterates the temporal argument that an interpretation of the deeds must seek the parties' intent at the time of their making, not at the time of the lawsuit. Central asserts that the district court erred in considering the present-day value of CBM as an energy source, when at the time the coal deeds were made, CBM was simply a hazardous by-product of coal mining which the mine owner/operator was required by law to ventilate for the safety of the miners. Central also suggests that the district court's application of its own context operated to impair the parties' freedom to contract.

The final issue briefed by Central is "[w]hether the District Court erred by failing to grant 'Plaintiff's Motion for Judicial Notice of Specific Facts.' " Central complains of the district court's finding that not all of the facts contained within the voluminous data it submitted were relevant. Central contends that the district court was required by K.S.A. 60-410(b)(2) to first take judicial notice of the facts and then determine their admissibility, e.g., relevancy. Accordingly, Central asks us to grant the motion and take judicial notice of the submitted material.

## STANDARD OF REVIEW

This appeal is from the district court's rulings on the summary judgment motions. Our summary judgment standard of review is well established. See, *e.g.*, *Nungesser v. Bryant*, 283 Kan. 550, 566, 153 P.3d 1277 (2007). However, the parties do not contend that there is a factual dispute. Therefore, our review is de novo. See *Botkin v. Security State Bank*, 281 Kan. 243, 248, 130 P.3d 92 (2006). Moreover, we are being asked to determine the legal effect of the coal deeds, which is a question of law subject to unlimited review. See *Conner v. Occidental Fire & Cas. Co.*, 281 Kan. 875, 881, 135 P.3d 1230 (2006) (The interpretation and legal effect of a written contract are matters of law over which an appellate court has unlimited review.).

## JUDICIAL NOTICE

We take the liberty of first dispensing with Central's complaint about the district court's ruling on the Plaintiff's Motion for Judicial Notice of Specific Facts, which with attachments was over 300 pages in length. Central apparently focuses on that portion of the memorandum decision which stated: "This Court does not believe that all of the facts contained within the data submitted by the plaintiff are relevant and therefore denies the plaintiff's request that the Court take judicial notice of *all* data submitted." (Emphasis added.)

Central argues that K.S.A. 60-409(c) requires a court to take judicial notice of a matter where the proponent has followed the statutory procedure, and that K.S.A. 60-410(b)(2) precludes the court from applying an exclusionary rule, except for a valid privilege. However, Central does not dispute that the court can decline to admit evidence which it finds to be irrelevant or immaterial, regardless of whether it is judicially noticed or offered by other means, such as through live testimony. Rather, Central contends that the district court should have first established the propriety of taking judicial notice of the proffered facts, before it proceeded to determine the admissibility of the evidence, *i.e.*, its relevance.

First, we reject Central's characterization of the district court's ruling. In providing a concluding summary of its findings, the court

specifically stated: "Even though the Court may not have been required to consider the extrinsic evidence offered by plaintiff, it did so." Thus, as a practical matter, Central got what it now contends that it should have received: an initial review of the proffered material and then a determination as to its relevancy or materiality to the issues presented in the case.

Next, the facts and circumstances that Central sought to establish through the judicial notice of the voluminous material attached to its motion are uncontroverted. The defendants do not dispute that: Coal mining in the late 19th century and early 20th century was dangerous and life-threatening for the miners, many of whom died as a result of explosions precipitated by CBM, then known as "fire damp," "marsh gas," etc.; at that time, coal mining was prevalent in Labette, Crawford, and Cherokee Counties, where miners died as a result of well-publicized explosions; one of the initial coal deed grantees, The Central Coal & Coke Company, was involved in area coal mining; owners/operators of coal mines were statutorily required to provide for the proper ventilation and control of the "fire damp" and were subject to damages and other sanctions for violating mine safety laws; and the purchasing power of a dollar today is much less than it was in 1924.

Finally, as will be discussed below, the proffered material does not support the conclusions which Central would have us draw from those facts. In short, a detailed analysis of Central's complaint about the district court's handling of its judicial notice motion is unnecessary for the resolution of this case.

*PROPOSED LEGAL THEORY*

Central's first tack is to propose that we adopt a "first severance/container theory" rule of law. Under that "rule," if a coal deed is the first conveyance which severs any mineral interest from the fee simple absolute estate, the grantee acquires ownership of everything that is contained within the coal formation, unless the deed contains a specific reservation of other minerals. Here, the only deed to contain a specific reservation was the coal deed conveying tract 12. However, Central does not provide a separate argument about that distinctive conveyance. Accordingly, we will not sepa-

rately analyze the effect of that reservation. See *Titterington v. Brooke Insurance*, 277 Kan. 888, Syl. ¶ 3, 89 P.3d 643 (2004) (point incidentally raised but not argued is deemed abandoned).

Central relies on case law from Alabama, Illinois, and Pennsylvania, contending that those states have adopted the "container theory." See *Vines v. McKenzie Methane Corp.*, 619 So. 2d 1305 (Ala. 1993); *Continental Resources v. Illinois Methane*, 364 Ill. App. 3d 691, 847 N.E.2d 897 (2006); *United States Steel Corp. v. Hoge*, 503 Pa. 140, 468 A.2d 1380 (1983). However, other jurisdictions have held that the ownership of coal does not include the ownership of CBM. See *Michael F. Geiger, LLC v. United States*, 456 F. Supp. 2d 885, 886 (W.D. Ky. 2006); *Carbon County v. Union Reserve Coal Co.*, 271 Mont. 459, 898 P.2d 680 (1995); *Harrison-Wyatt, LLC v. Ratliff*, 267 Va. 549, 593 S.E.2d 234 (2004). Decisions in Wyoming have gone both ways, focusing on the facts and circumstances of each particular deed. See *Mullinnix LLC v. HKB Royalty Trust*, 126 P.3d 909 (Wyo. 2006); *Caballo Coal v. Fidelity Exploration*, 84 P.3d 311 (Wyo. 2004); *Hickman v. Groves*, 71 P.3d 256 (Wyo. 2003); *McGee v. Caballo Coal Co.*, 69 P.3d 908 (Wyo. 2003); *Newman v. RAG Wyoming Land Co.*, 53 P.3d 540 (Wyo. 2002). Given the unique facts of each case, together with differing state laws, the cases from other states are not easily synthesized or particularly persuasive.

In this state, all minerals belong to the landowner and are considered part of the realty so long as they reside on, in, or under the land. However, "[w]hen they escape and go into other lands, or come under another's control, the title of the former owner is gone." *Zinc Co. v. Freeman*, 68 Kan. 691, 696, 75 Pac. 995 (1904). A severance of the surface and mineral rights is accomplished by either a conveyance of the land with an express reservation of the minerals, or by a conveyance of the mineral or mining rights. After the severance, two separate estates exist, each being a distinct freehold estate of inheritance. The surface and the mineral rights are held by separate titles in severalty. *Mining Co. v. Atkinson*, 85 Kan. 357, 360, 116 P. 499 (1911); *Moore v. Griffin*, 72 Kan. 164, 167-68, 83 Pac. 395 (1905); see also *Rathbun v. Williams*, 154 Kan. 601, 604, 121 P.2d 243 (1942) ("[W]henever the mineral interest in land

is owned separately from the surface rights, each interest is regarded as real estate and taxed separately to the respective owners thereof.").

Central's argument recognizes that the mineral interest in land can be further divided by severing a particular mineral. *Cf. Shaffer v. Kansas Farmers Union Royalty Co.*, 146 Kan. 84, 89, 69 P.2d 4 (1937) (owner of land can convey all of it or a part of it; can divide property vertically or horizontally). In other words, only one mineral, such as coal, can be conveyed, resulting in different entities owning different minerals. Indeed, at oral argument, Central acknowledged that the coal deeds did not give it ownership of the gas which had escaped from the coalbed, *i.e.*, it does not claim to own *all* of the gas under the subject real estate. Thus, Central's theory would effect a split ownership of all the remaining minerals, with the landowner still owning all noncoal minerals except those that may be located within a seam of coal, even though the deeds did not explicitly convey any mineral other than coal.

Pointedly, the coal deeds did not purport to convey any particular stratum or horizon, *e.g.*, the Pittsburg-Weir formation. They conveyed all the coal, wherever situated, presumably because there might be several seams of coal underlying the property. Nevertheless, Central claims that the coal deeds must, by necessity, convey the entire stratum because the mining of the coal consumes all of the structure and destroys all of the minerals within the stratum. Granted, each deed specifically grants the right to mine and remove the coal, which would permit the removal of the entire stratum, plus such of the surrounding strata as may be necessary to effect the coal removal. However, that right does not convey *ownership* of the entire stratum, any more than it conveys ownership of the dirt and rock outside the coalbed which might be removed to allow for a safe mining operation.

Moreover, Central offers nothing persuasive to recommend the adoption of its proffered temporal rule, which gives the grantee of the first mineral interest to be severed superior rights in and to the *other* minerals conveyed to another grantee (or still held by the landowner) simply based on the timing of the deed. While a "first-in-time, first-in-right" rule is a logical manner in which to deal with

competing claims to the same property, it makes scant sense as a rule to enlarge or expand the property conveyed beyond that which was described in the deed.

In short, we decline to adopt an artificial rule of law mandating that a conveyance of all coal, with the right to remove and mine the same, always effects a transfer of everything that may be contained within the strata where coal may be found. Rather, if a coal deed is to include the CBM, that inclusion must emanate from the parties' intent.

### RULES OF DEED INTERPRETATION

As an alternative to its proposed first severance/container theory rule of law, Central argues that the deeds should be interpreted as manifesting an intent to convey the CBM. The district court found that the parties to the deeds did not contemplate the transfer of CBM, because at that time, it was simply a dangerous by-product of coal mining. Central asks us to revamp the way in which we interpret deeds in order to divine such an intent.

We have well-established rules that are applied to the interpretation of both deeds and contracts. See *Hall v. Mullen*, 234 Kan. 1031, 678 P.2d 169 (1984). The primary consideration, when construing the meaning of a deed, is the intention of the grantor as gathered from an examination of the instrument as a whole. *Bennett v. Humphreys*, 159 Kan. 416, 419, 155 P.2d 431 (1945).

We ordinarily recite that the first step is to determine whether the instrument is ambiguous. *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 582, 738 P.2d 866 (1987). In doing so, we apply the plain, general, and common meaning of the terms used in the instrument. *Johnson v. Johnson*, 7 Kan. App. 2d 538, 542, 645 P.2d 911, *rev. denied* 231 Kan. 800 (1982). We refrain from adding words into the instrument which would impart an intent that was wholly unexpressed when it was executed. *Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978). In other words, we strive to determine the document's meaning and the parties' intent from within its four corners; we consider, construe, and harmonize the entire instrument without isolating any one par-

ticular sentence or provision. *In re Estate of Kruckenberg*, 171 Kan. 450, 454, 233 P.2d 472 (1951).

An instrument is ambiguous when the application of pertinent rules of interpretation to the whole "fails to make certain which one of two or more meanings is conveyed by the words employed by the parties. [Citations omitted.]" *Wood v. Hatcher*, 199 Kan. 238, 242, 428 P.2d 799 (1967). If we find ambiguity, then

" ' "facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard, but not for the purpose of varying and nullifying its clear and positive provisions." [Citations omitted.]' *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 624, 602 P.2d 1299 (1979)." *Butts v. Lawrence*, 22 Kan. App. 2d 468, 473, 919 P.2d 363 (1996).

See also *Hall v. Mullen*, 234 Kan. 1031, 1037-38, 678 P.2d 169 (1984) (same). We have also looked at the parties' subsequent conduct where their actions manifested a mutual understanding of the contract's meaning. See *Cline v. Angle*, 216 Kan. 328, 333-34, 532 P.2d 1093 (1975).

Central challenges the efficacy of our long-standing rules of interpretation, declaring that "[t]he most fickle of the analytical tools used to 'interpret' documents is the declaration that a document is either 'ambiguous' or 'unambiguous.' " It argues that extrinsic evidence is always necessary to establish a context for ascribing a meaning to the words the parties employed. Central then points out that, although the district court in this case declared the deed language to be unambiguous, it nevertheless was required to resort to extrinsic evidence when it referred to the dictionary definition of "coal" and relied upon information contained in appellate cases from Montana and Wyoming. Of course, information gleaned from treatises or appellate opinions is not generally considered to be extrinsic evidence.

However, we do agree that whenever one endeavors to ascertain the meaning of written words, it is necessary to consider them within the context that they are used. Hence, we examine the whole document when determining its meaning. Moreover, certain terms may have a commonly understood meaning within a trade or industry, so that a commercial contract between parties that are reg-

ularly engaged in that trade or industry would be construed in the context of that common usage. However, that does not mean that the words employed are, inherently, always ambiguous, *i.e.*, subject to two or more meanings. The ambiguity analysis endeavors to simply give effect to what the parties actually said they meant at the time of contracting. We are not prepared to abandon that analytical tool.

Likewise, we decline Central's invitation to divine from selected statements in prior cases a reasonably intelligent business person interpretive model. Our focus is to discern the actual agreement between these particular people, rather than what was the most intelligent agreement which could have been reached. Therefore, we see no need to change our long-standing interpretive process, which has been expressed as follows:

"A rule for the construction of deeds as well as wills, to which all other rules are subordinate, is that the intention of the grantors as garnered from all parts of the deed is to be given effect, and that doubtful or inaccurate expressions in a deed shall not override the obvious intention of the grantors. In construing a deed, the court puts itself as nearly as possible in the situation of the grantors when they made the deed and, from a consideration of that situation and from the language used in each part of the deed, determine as best it can the purpose of the grantors and the intentions they endeavored to convey. [Citations omitted.]" *Davis v. Vermillion*, 173 Kan. 508, 510, 249 P.2d 625 (1952).

*APPLICATION OF R.S. 1923, 67-202*

Central also contends that the provisions of R.S. 1923, 67-202, the predecessor to K.S.A. 58-2202, control the extent of the property transferred by the coal deeds, notwithstanding any problem ascertaining the parties' intent. As noted above, that statute provided, in relevant part, that "every conveyance of real estate shall pass all the estate of the grantor therein, unless the intent to pass a less estate shall expressly appear or be necessarily implied in the terms of the grant." R.S. 1923, 67-202. Our interpretation of that statute is a question of law, subject to unlimited review, and unconstrained by the district court's interpretation. *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007).

Central argues that the statute provides a presumption that the transfer of the "coal estate," together with the right to mine and remove the coal, transfers all of the grantors' interest in that estate, in the absence of an express reservation. Then, to make the argument work, Central declares that CBM is a part of the "coal estate" because it is a byproduct of the coalification process, it exists as part of the coal seam, and it is released as part of the coal mining process. We find the argument unavailing on more than one level.

The purpose of the statutory provision at issue is to clarify that a real estate conveyance passes all of the grantor's *interest* in the land, unless an intent to pass a lesser interest is manifested in the terms of the grant. See *Platt v. Woodland*, 121 Kan. 291, 298, 246 Pac. 1017 (1926). For instance, in the cases relied upon by Central, *Fast v. Fast*, 209 Kan. 24, 29, 496 P.2d 171 (1972), and *Brungardt v. Smith*, 178 Kan. 629, 637-38, 290 P.2d 1039 (1955), the provision was applied to clarify that the grantors conveyed all the interest they owned in the subject real estate, because the deeds did not express an intent to retain any interest.

In this case, the grantors owned the entire fee simple absolute in the subject real estate. Obviously, the coal deeds did not pass all of that interest to Central's predecessors. By the express terms of the coal deeds, each grantor stated an intent to pass a lesser estate, *i.e.*, only the coal. Given that the deeds expressly tell us that not all of the grantors' estates passed to the grantees, we need not resort to the statutory presumption.

Even if the statute could be construed as meaning that a conveyance of a lesser estate passes all of the grantor's interest in that lesser estate, it would not help in this instance. No one disputes that the deeds conveyed all of the grantors' interests in the coal. The disconnect in Central's argument is its declaration that CBM is part of the "coal estate."

Central does not dispute that coal, CBM, and oil are separate minerals which have different chemical compositions and which exist in different states, *i.e.*, solid, gas, and liquid. However, it points out that CBM is produced by the coalification process, implying that the common origin makes the gas part of the coal estate. At oral argument, Central acknowledged that the gas which has

escaped from the coalbed is not part of the "coal estate," but rather it is part of a "gas estate" which defendants have a right to produce. Of course, the escaped gas was formed in exactly the same manner as the gas which is currently held captive by the pressure on the coalbed. Thus, the genesis of CBM is not determinative.

Likewise, the argument that CBM is contained within the coalbed is not compelling. Gas is stored in all rock formations in the same three states or conditions as it is found in the coalbed: as free gas, dissolved in the water in the coal, and adsorbed on the solid surface of the coal. See *Amoco*, 526 U.S. at 873. Granted, the large surface area of coal pores results in a higher proportion of the gas being adsorbed in a coal formation. Nevertheless, the physical description of a mineral should not turn on the quantity that is present in a particular source rock or formation.

Further, the fact that CBM escapes during the traditional coal mining operation does not persuade us that gas is coal. Today, it is apparently possible to drill from the surface and relieve the pressure, allowing the CBM to "desorb" and be collected, while leaving the coal rock in place. While Central complains that such a process invades and damages the coalbed, the issue of whether the gas producer must compensate the coal owner for damages resulting from the process of liberating the gas is not before us. The point is that CBM is a gas that can be produced without mining the coal rock, contradicting the assertion that the CBM is part and parcel of the "coal estate."

In short, we reject the notion that "all coal" should be read as meaning a "coal estate" that includes such of the natural gas which may be currently held captive within the coal formation. Therefore, CBM is not statutorily presumed to be conveyed by a grant of "all coal."

*THE PARTIES' INTENT*

Having rejected Central's proffered matter of law approach and declined the invitation to reform our rules for construing deeds, we proceed to determine what property the parties intended to pass by the coal deeds. In doing so, this court must put itself

"as nearly as possible in the situation of the grantors when they made the deed and, from a consideration of that situation and from the language used in each part of the deed, determine as best it can the purpose of the grantors and the intentions they endeavored to convey. [Citations omitted.]" *Davis*, 173 Kan. at 510.

As Central painstakingly sets forth in its brief, at the time of the subject deeds, the parties would have been aware that a gas, commonly referred to as "fire damp" or "marsh gas," was released during the process of digging coal out of the ground and that the gas was a source of great danger to life in coal mines. See *Amoco*, 526 U.S. at 874. They would not have been privy to our current scientific knowledge about the manner in which a portion of the CBM remains captive within the coal, *i.e.*, adsorbed to the surface of the rock. Rather, the common understanding at that time was that the term "coal" did not encompass CBM, "both because it is a gas rather than a solid mineral and because it was understood as a distinct substance that escaped from coal as the coal was mined, rather than as a part of the coal itself." *Amoco*, 526 U.S. at 874-75. Therefore, the facts and circumstances existing in 1924-26 would suggest that a grantor's use of the term, "coal," was intended to refer only to the solid mineral. Accordingly, a grantor would have no reason to include a reservation of gas in a coal deed.

Moreover, the primary energy source of that era was coal. See *Amoco*, 526 U.S. at 875 ("In contrast to natural gas, which was not yet an important source of fuel at the turn of the century, coal was the primary energy for the Industrial Revolution."). In historical context, the obvious purpose of the coal deeds was to effect the sale of the commodity which was valuable at the time, *i.e.*, coal. In reality, the parties to the coal deeds probably had no specific intent regarding other unspecified minerals, such as coalbed methane. Pierce, *Evaluating the Jurisprudential Bases for Ascertaining or Defining Coalbed Methane Ownership*, 4 Wyo. L. Rev. 607 (2004).

Central points out that the deeds specifically granted its predecessors "the right to mine and remove [the coal]." It suggests that the circumstances under which that right would have been executed should indicate to us that the parties impliedly intended for the CBM ownership to pass to the coal deed grantees. Central

contends that the evidence it proffered for judicial notice supports that theory. We disagree.

Central wants us to consider that CBM was dangerous and life threatening for the miners and that the mine operator had a legal duty to ventilate and control the gas during the mining process. It then argues that a landowner surely would not have intended to reserve ownership of such a deadly substance. But, of course, on the flip side, one would not expect a grantee to voluntarily seek full ownership of the CBM, knowing it to be a worthless and hazardous material. To the contrary, one would suspect that a mine operator in those days would have been ecstatic if the landowner had removed the CBM prior to the commencement of mining operations, thus relieving the operator of the cost of meeting its legal responsibility to dispose of the gas.

Central also points out that, under the technology existing at that time, the process of mining and removing the coal resulted in the destruction or loss of all the CBM. Therefore, the argument continues, the parties must have intended that the CBM ownership would pass with the coal deeds. We do not reach the same conclusion. Obviously, the parties expected the CBM in a particular seam to escape while the grantee was exercising the right to mine and remove the coal from that coalbed. However, they would have considered that as a necessary consequence of the mining operation. From the deed language, we cannot divine that the grantors contemplated that the grantee could separately own and produce the CBM without exercising the right to mine and remove the coal, *i.e.*, drill from the surface and remove CBM while leaving the coal in place.

Curiously, Central makes the economic argument that the "facts existing at the time of the conveyances make it wholly unreasonable to suggest that Central would have paid what in today's dollars would be $841,104.24 for 'all coal' but not intend to obtain all rights to methane gas known to exist within the coal." The major premise Central strives to establish with its historical material is that CBM was an extremely hazardous material which it was legally and economically responsible for controlling during the mining process. The conclusion that a portion of the coal purchase price was allo-

cated to obtaining ownership of the CBM does not follow from that premise. To the contrary, one would expect the additional operational expense caused by the CBM to be a deduction from the purchase price, rather than an addition. By way of analogy, if a rancher purchased a pasture containing noxious weeds which by law must be eradicated, one would not say that the rancher paid a portion of the purchase price to obtain ownership of the burdensome weeds.

In short, at the time the coal deeds were executed, the purpose of each grantor was to consummate the sale of the solid mineral coal. CBM was simply a hazardous by-product of the coal mining process. The parties did not intend, either expressly or impliedly, for the coal deeds to pass ownership of the CBM. The district court's granting of summary judgment on the issue of ownership is affirmed.

Affirmed.