(235 P.3d 494)
No. 101,058

CORNERSTONE HOMES, LLC, v. SHAWN D. SKINNER, GARY W. SKINNER, and ALBERTA E. SKINNER, *Appellants*, and FHL BANK, TOPEKA, and FORD MOTOR CREDIT COMPANY, *Defendants*.

Opinion filed June 25, 2010.

*Barry L. Arbuckle*, of Wichita, for appellants.

*Jeff Griffith*, of Derby, for appellee.

Before HILL, P.J., PIERRON, J., and BUKATY, S.J.

BUKATY, J.: Cornerstone Homes, LLC (Cornerstone), is a seller of mobile homes, sometimes referred to as manufactured homes. It sold such a home to Gary, Alberta, and Shawn Skinner, who made a cash down payment. They signed a note and gave a mortgage on certain real estate they owned in favor of Cornerstone for the remainder of the purchase price. The Skinners later defaulted in their payments, and Cornerstone filed suit to foreclose its mortgage. The Skinners never denied signing the mortgage or defaulting on their payment obligations. In their defense, they argued that Cornerstone was guilty of fraud for failing to deliver to them the manufacturer's statement of origin (MSO) for the mobile home and this precluded Cornerstone from obtaining judgment for the amount due and for foreclosure of its mortgage. The Skinners also counterclaimed for damages on various theories all based essentially on Cornerstone's failure to deliver the MSO. They also sued Jack Hunt, a principal in Cornerstone on these same claims. That suit was consolidated with Cornerstone's foreclosure action. The district court granted Cornerstone the judgment it requested and denied all of the Skinners' claims.

All the arguments of the Skinners in this appeal raise as their core issue the question of whether the failure of a seller of a new mobile home to deliver the MSO to the buyer as required by statute is fraudulent as a matter of law and voids the sale. We answer the question, "No." This finding, in essence, defeats the Skinners' defense to Cornerstone's foreclosure petition and all of their claims against Cornerstone and Hunt. We affirm.

After negotiations with Cornerstone's principals, Jack and Vicki Hunt, the Skinners agreed to purchase the home. According to the bill of sale, the total sales price including tax was $48,258. The Skinners made a down payment of $4,700, and Cornerstone agreed to finance the remainder of the purchase price at 12% interest. As collateral, Cornerstone took a 30-year mortgage on the Skinners' real property where the home would be placed.

The parties closed on the purchase on May 10, 2004. Hunt represented Cornerstone at the closing. At that time, Hunt did not have in his possession the MSO for the mobile home. The MSO is required for the Kansas Department of Revenue to issue an initial certificate of title. See K.S.A. 58-4204(e). According to notes taken by the closing representative of the title insurer, First American Title/Columbian Title (First American), Hunt stated: " 'He should have [it] in a couple of weeks.' " The home was delivered to the Skinners' property within 3 days of closing. Cornerstone recorded its mortgage on the Skinners' real property on May 13.

The Skinners made full, timely payments to Cornerstone for the next year. However, they were unable to make their full July 2005 payment after Gary Skinner suffered a heart attack. The Skinners contacted Cornerstone and made a partial payment for that month. Hunt reacted negatively to this, and the Skinners sought to refinance the property with another lender as a result.

The Skinners never obtained any alternate financing. First American became involved, apparently, at the Skinners' request. It was soon discovered that Cornerstone had never provided the MSO for the mobile home, and, consequently, no certificate of title had ever been issued. On July 28, 2005, First American sent Cornerstone a letter requesting information on the status of the mobile home's title. Cornerstone did not respond to the letter. The Skinners never obtained alternative financing and did not make any payments to Cornerstone after August 2005. They apparently continued to live in the home, at least up to the time of the trial.

Cornerstone filed suit to foreclose on the mortgage on March 7, 2006. On April 12, 2006, the Skinners filed a one-page, handwritten response in which they summarily denied the petition's allegations and stated they were refinancing the property and would

be able to pay in full. On May 1, the district court granted Cornerstone default judgment and ordered a Sheriff's sale of the mortgaged property to satisfy the judgment.

In October 2006, the district court set aside the default judgment on the Skinners' motion and allowed them to file an answer. The Skinners filed an answer and argued that the transaction with Cornerstone was fraudulent and void under K.S.A. 58-4204 because Cornerstone never provided them with the MSO or a certificate of title. They claimed the sale was void and demanded return of their monthly payments, the down payment, and closing costs plus cancellation of the mortgage.

The Skinners also filed a number of counterclaims against Cornerstone relating to Cornerstone's failure to provide the MSO. The first claim alleged statutory fraud under K.S.A. 58-4204. The second alleged that Cornerstone violated the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, by failing to provide them with the MSO, by filing a false lawsuit, and by acting in an unconscionable manner.

Prior to trial, the district court disposed of the Skinners' claims for statutory fraud in its ruling on a summary judgment motion filed by Cornerstone. It found that Cornerstone did not provide the Skinners with the MSO within 30 days of closing. However, the court agreed with Cornerstone that the Skinners were relying on the wrong section of K.S.A. 58-4204 as the basis for their fraud claim. Specifically, the court concluded that K.S.A. 58-4204(e) applied, rather than the section relied upon by the Skinners—K.S.A. 58-4204(h)—and that the applicable subsection did not provide that failure to deliver the MSO amounted to a fraudulent act or would it void the transaction between Cornerstone and the Skinners. The court declined to grant Cornerstone summary judgment on the Skinners' KCPA claims.

At the time it ruled on the summary judgment motion, the district court also orally announced a number of factual findings relevant to the foreclosure claim of Cornerstone. The court found the Skinners had agreed to purchase and Cornerstone had agreed to sell the manufactured home, Cornerstone did not have possession of the MSO at the time the purchase was closed, the purchase was

financed with a note and mortgage on real estate the Skinners owned, and the Skinners were in default for nonpayment of amounts due Cornerstone. The Skinners did not object to these findings.

The parties then proceeded to trial in June 2008 on the remaining claims. Prior to hearing evidence on the Skinners' KCPA claims, the district court indicated that based upon the prior record in the case including the pretrial order and previous findings entered by the court, it appeared there was no dispute the Skinners had signed the note and mortgage and they had defaulted on their payment obligations contained in them. The court further indicated that since there had been a determination that Cornerstone's failure to deliver the MSO was not a fraudulent act that voided the transaction, Cornerstone was then entitled to judgment on its foreclosure claim.

Then, as to the Skinners' KCPA claims, the court heard the testimony of Vicki Hunt. She described the procedures normally taken relative to the procurement of the MSO for a new mobile home. She testified that the MSO was typically sent directly from the supplier to the title company after Cornerstone paid the supplier for the unit. She stated that Cornerstone paid the supplier and had no reason to believe that it would not issue the MSO for the mobile home. She admitted that no one at Cornerstone followed up to confirm whether the MSO had in fact been sent. She stated that she had not read First American's July 28, 2005, letter and was not aware the Skinners had never been provided with the MSO until October 2006, after Cornerstone had initiated the foreclosure action against the Skinners. Then once she became aware that the Skinners did not have the MSO, Cornerstone obtained a duplicate MSO from the mobile home supplier and offered it to Skinner. The Skinners apparently refused to accept it.

The district court granted Cornerstone's petition for judgment in the amount of $61,066.33 and for foreclosure of its mortgage. It also granted Cornerstone judgment as a matter of law on the Skinners' KCPA claims, finding that the Skinners failed to prove by a preponderance of the evidence that Cornerstone violated the KCPA in not delivering the MSO as required in K.S.A. 58-4204(e).

*Statutory Fraud*

The parties argue this issue on appeal as they did in the district court. The Skinners contend that the district court erred in not applying the statutory fraud provision of K.S.A. 58-4204(h) (2007/2008 amendments not applicable) in denying the counterclaim based upon statutory fraud. Cornerstone counters that under the plain language of the statute, K.S.A. 58-4204(h) does not apply and the district court properly applied K.S.A. 58-4204(e).

Where there is no factual dispute, appellate review of an order regarding summary judgment is de novo. *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 240, 201 P.3d 680 (2009). Furthermore, this case requires the court to interpret the relevant statutes, which is an issue over which an appellate court has unlimited review. *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271, 202 P.3d 7 (2009). An appellate court's first task is to " 'ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning.' [Citation omitted.]" *State v. Gracey*, 288 Kan. 252, 257, 200 P.3d 1275 (2009).

The sale of mobile homes in this state is governed by the Kansas Manufactured Housing Act. K.S.A. 58-4201 *et seq.* K.S.A. 58-4204 sets out the procedural requirements for transferring title to such a home. Subsection (e) of that statute governs the transfer of title of a *new* mobile home. That section states:

"Dealers shall execute, upon delivery to the purchaser of every new manufactured home, a manufacturer's statement of origin stating the liens and encumbrances thereon. Such statement of origin shall be delivered to the purchaser at the time of delivery of the manufactured home or at a time agreed upon by the parties, not to exceed 30 days, inclusive of weekends and holidays. The agreement of the parties shall be executed on a form approved by the director. In the event delivery of title cannot be made personally, the seller may deliver the manufacturer's statement of origin by restricted mail to the address of the purchaser shown on the purchase agreement. The manufacturer's statement of origin may include an attachment containing assignment of such statement of origin on forms approved by the director. Upon the presentation to the division of a manufacturer's statement of origin, by a manufacturer or dealer for a new manufactured home, sold in this state, a certificate of title shall be issued." K.S.A. 58-4204(e).

The Skinners contend that another part of K.S.A. 58-4204 applies here, subsection (h):

"In the event of a sale or transfer of ownership of a manufactured home or mobile home for which a certificate of title has been issued, which certificate of title is in the possession of the transferor at the time of delivery of the manufactured home or mobile home, the holder of such certificate of title shall endorse on the same an assignment thereof, with warranty of title in a form prescribed by the director and printed thereon, and the transferor shall deliver the same to the buyer at the time of delivery to the buyer of the manufactured home or mobile home, or at a time agreed upon by the parties, not to exceed 30 days, inclusive of weekends and holidays, after the time of delivery. *The sale of a mobile home or manufactured home by a manufactured home dealer without such delivery of an assigned certificate of title is fraudulent and void, and it shall constitute a violation of the Kansas manufactured housing act.* The agreement of the parties shall be executed on a form provided by the division. The requirements of this subsection concerning delivery of an assigned title are satisfied, if the transferor mails to the transferee, by restricted mail, the assigned certificate of title within the 30 days, and if the transferor is a dealer, as defined by K.S.A. 58-4202, and amendments thereto, such transferor shall be deemed to have possession of the certificate of title, if the transferor has made application therefore to the division." (Emphasis added.) K.S.A. 58-4204.

Clearly, K.S.A. 58-4204(e) applies to the sale of new manufactured homes and requires that the MSO for such a home be delivered by the seller to the buyer within 30 days of delivery of the home. When that MSO is then presented to the Kansas Department of Revenue, a certificate of title is issued. Nowhere in the section, however, is there any mention that failure to deliver the MSO is a fraudulent act or that it voids the sale of the new manufactured home. In contrast, K.S.A. 58-4204(h) which the Skinners rely on obviously applies to the sale of manufactured homes for which a certificate of title has already been issued, such as a pre-owned home. This section provides that the sale or transfer of such a home without delivery of the certificate of title is fraudulent and void. In this case we are concerned with the sale of a new manufactured home for which no certificate of title has yet been issued. Subsection (h) of the statute has no relevance and is not applicable.

Clearly, subsection (e) of K.S.A. 58-4204 that is applicable to this case is silent as to whether the failure to comply with delivery of the MSO constitutes fraud. In applying the plain and ordinary

meaning to the words of the subsection, we believe it would read too much into the statutory subsection to construe it to mean that the failure to deliver the MSO in the sale of a *new* home constitutes fraud and voids the transaction. This is particularly apparent since another subsection specifically provides that failure to deliver an assigned certificate of title in the sale or transfer of a *preowned mobile home for which a certificate of title has already been issued* is fraudulent and void. The absence of a reference to fraud in the first situation is significant. Had the legislature intended to make it fraudulent to not timely deliver the MSO in that instance, it very easily could have done so.

The Skinners' argument that Cornerstone's failure to provide them with the MSO was fraud is based almost entirely on a 1968 case in which our Supreme Court interpreted the predecessor statute to K.S.A. 58-4204. In *Wilcox Trailer Sales, Inc. v. Miller*, 200 Kan. 315, 323, 436 P.2d 860 (1968), the court affirmed a district court's ruling that the failure of a dealer to provide a buyer of a mobile home with a "bill of sale" at the time of purchase of a new home rendered the transaction fraudulent and void. The statute in effect at that time which governed the sale of mobile homes was the same statute that governed the transfer of other motor vehicles. It required a dealer to provide the buyer with a bill of sale at the time of purchase. See K.S.A. 8-135 (Corrick 1964). The court reasoned that because a certificate of title had not yet been issued, this bill of sale "is the origin of the purchaser's title to the vehicle." *Wilcox*, 200 Kan. at 320. The court then equated a bill of sale with a certificate of title. And, because it was unlawful to buy or sell any vehicle without transferring a certificate of title and any such sale was fraudulent and void under the applicable statute, the sale of the mobile home in that case was deemed fraudulent and void. 200 Kan. at 320-23.

While the facts of *Wilcox* are very similar to those in this case, the statutes in effect now that govern the sale and transfer of mobile homes are different. Primarily, the relevant sections of K.S.A. 8-135 (Corrick 1964) applied to *every* vehicle transfer whether it involved a new vehicle or a vehicle for which a certificate of title had previously been issued. Subsection (c)(3) of the statute re-

quired the execution of a bill of sale "upon delivery to the purchaser of every vehicle" and subsection (c)(6) of K.S.A. 8-135 (Corrick 1964) made it unlawful "for any person to buy or sell in this state any vehicle" without the transfer of a certificate of title. K.S.A. 2009 Supp. 8-135 contains this same language today, but the statute no longer applies to the sale of mobile homes. The applicable statutory subsections today are K.S.A. 58-4204(e) and (h) which, as we have pointed out, treat the failure to deliver the MSO for a new home and the failure to deliver an already issued certificate of title on a preowned mobile home differently as to whether they constitute fraud. As a result, while K.S.A. 8-135(c)(3) and (c)(6) (Corrick 1964) could be read together because they both applied to every vehicle transaction, K.S.A. 58-4204(e) and (h) are distinct and different in their application. They apply to transactions involving different classifications of manufactured homes, new ones and ones that have previously been issued a certificate of title.

We are not persuaded by the Skinners' argument that the relevant subsections of K.S.A. 58-4204 are a mere continuation of K.S.A. 8-135 (Corrick 1964) and that *Wilcox* should still control. They cite a number of decisions in support of the argument. None, however, explain how or why the newer statutory scheme is a mere continuation of the older one in light of the significant differences in language that we have pointed out.

Even though this case involves the sale of a new manufactured (mobile) home, the Skinners further argue that we should treat the MSO as the equivalent to a certificate of title because the two documents are both primary evidence of ownership and the failure to provide either should result in the same remedy for the purchaser: avoidance of the transaction. Again, however, the plain language of the applicable statutory subsections treat the failure to deliver the required documents differently depending on the type of mobile home involved.

While clearly Cornerstone did not comply with the statutory requirement that it deliver the MSO to the Skinners, the district court correctly found Cornerstone's failure to do so did not amount to fraud under the controlling statute and did not void the transaction. It is the legislature that established in plain language the

requirement that a seller of a *new* manufactured home deliver the MSO to the buyer and that the seller of a *preowned* manufactured home for which a certificate of title has been issued must deliver the assigned certificate of title to the buyer. It is the legislature that omitted any reference to fraud when a seller in the first instance fails to deliver the MSO but then specified that it would constitute fraud when a seller in the second instance fails to deliver the assigned certificate of title as required. The intent of the legislature is expressed through the plain language of the applicable statutory subsections and we will not inquire into its intent in not mentioning a remedy or consequence for failure to deliver the MSO in the first instance. See *Double M Constr.*, 288 Kan. at 271-72.

*Cornerstone's Judgment on Its Foreclosure Claim*

The Skinners next argue that the district court erred in *sua sponte* granting Cornerstone's petition to foreclose on their real estate prior to commencement of trial. They argue that because they never received title to the mobile home, they received no consideration for signing the purchase agreement. They further argue that Cornerstone breached the sales contract by failing to provide the MSO.

The Skinners' argument is simply an attempt to reframe their argument that Cornerstone's failure to provide the Skinners with the MSO should void the sale. Also, they never raised defenses of failure of consideration and breach of contract to the district court. They cannot now raise them on appeal. See *Miller v. Bartle*, 283 Kan. 108, 119, 150 P.3d 1282 (2007).

In any event, the Skinners' arguments on this issue are without merit. We note that evidence of the Skinners' debt is attached to Cornerstone's amended petition. As we stated, the district court entered findings at the beginning of the trial, based upon the record in the case, that Cornerstone had proven the parties had executed the relevant documents creating the Skinners' debt and mortgage, the Skinners never denied they had defaulted, and the Skinners never disputed these crucial facts. The Skinners do not challenge on appeal the sufficiency of those factual findings. Those

facts along with the ruling on summary judgment that failure of delivery of the MSO did not void the transaction clearly establish that Cornerstone was entitled to judgment on its foreclosure claim as a matter of law even prior to the court hearing evidence on the Skinners' counterclaims in the case.

Furthermore, although not raised by either party, it appears that valid title did vest with the Skinners even though they were not provided with a document of title. This court has previously held that a sale or purchase of a mobile home is a transaction for the sale of goods that is governed in part by the Kansas Uniform Commercial Code (UCC). *Linscott v. Smith*, 3 Kan. App. 2d 1, 3, 587 P.2d 1271 (1978); see K.S.A. 84-2-102. Under K.S.A. 84-2-401(2), title to the goods purchased passes to the buyer on delivery "even though a document of title is to be delivered at a different time or place." Here, title passed to the Skinners when the manufactured home was delivered to their property, even though they had not yet received the MSO.

The district court correctly determined that Cornerstone was entitled to judgment on its foreclosure claim based upon the record before it.

*Claims Under the Kansas Consumer Protection Act*

After hearing evidence, the district court denied the Skinners' claims brought under the KCPA and granted Cornerstone judgment on all of them as a matter of law. The Skinners claim the court erred in each instance. The parties do not dispute the relevant facts. Consequently, we have de novo review of the district court's entry of judgment. See *Deal v. Bowman*, 286 Kan. 853, 858, 188 P.3d 941 (2008).

The Skinners first argue that Cornerstone's failure to provide the MSO amounted to a per se deceptive act which is prohibited under two subsections of K.S.A. 50-626, specifically, (b)(1)(A) and (b)(8) (2009 amendments not applicable). Under K.S.A. 50-626(b)(1)(A), it is a deceptive act to make a representation "knowingly or with reason to know" that "[p]roperty or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have." Under K.S.A.

50-626(b)(8), a supplier is prohibited from "falsely stating, knowingly or with reason to know, that a consumer transaction involves consumer rights, remedies or obligations."

In essence, the Skinners argue that the failure to comply with a requirement in another separate and distinct statute to provide the MSO constitutes a violation of these KCPA sections. They provide no persuasive authority that is on point for this position. Nor have they established that Cornerstone's failure to deliver the MSO constitutes the type of violation described in the subsections they cite.

As to the Skinners' claim under K.S.A. 50-626(b)(1)(A), the undisputed facts contain no mention or reference to any misrepresentation Cornerstone made knowingly or with reason to know of its falsehood. It is true that if a supplier commits a "deceptive act" under the subsection, the buyer does not have to prove it relied upon the representation to obtain relief under the KCPA. However, the buyer still must establish that there was a misrepresentation of the type described in the subsection. While Cornerstone did not comply with the requirement that it deliver the MSO, it made no misrepresentations that can be construed as deceptive under this statute.

The Skinners contend that Cornerstone, as the seller of the manufactured home, represented as a matter of law it would comply with the law governing the sale and deliver the MSO and that its subsequent failure to do so renders the prior representation a falsehood. The Skinners base this argument on the proposition that the statutory law governing transactions are a part of those transactions. The Skinners extend this argument to imply that the supplier makes an affirmative statement that it already had or would comply with that statutory law and its failure to comply would then subject it to liability under the KCPA. However, none of the cases they cite in support of this argument are on point as they all involve actual misrepresentations made in addition to violations of a separate statute. The Skinners provide no other authority to support their argument, and we are not persuaded by it. To conclude otherwise would render any consumer transaction that involved noncompliance with a separate statute a violation of the KCPA. With no statutory basis to do so, we cannot make that stretch.

In addition, even if we imputed an affirmative statement in these circumstances to a supplier to the effect that it had or would timely deliver the MSO, such a statement is not the type described in K.S.A. 50-626(b)(l)(A) which would then subject it to liability under the KCPA. To aid in the application of this subsection, the Kansas comment to the section states that it "forbids such conduct as misrepresenting the durability or components of a product, or the efficacy of a service." K.S.A. 50-626, comment 2. Both the plain language of the subsection and its accompanying comment indicate that it refers to misrepresentations relating to the physical or qualitative properties of the subject matter of the transaction.

The Skinners also argue that Cornerstone's failure to provide the MSO violated K.S.A. 50-626(b)(8). That statute prohibits a supplier from "falsely stating, knowingly or with reason to know that a consumer transaction involves consumer rights, remedies or obligations." The Kansas comment for this subsection states that it "proscribes statements such as one asserting that an installment contract must be paid in full irrespective of a defense, or that a supplier can [garnish] exempt wages." K.S.A. 50-626, comment 2. The Skinners have not established how Cornerstone's failure to provide the MSO somehow constitutes a statement about the their rights which would bring the statement within the proscriptions of this subsection. The Skinners' claim here is without merit.

The Skinners also argue that Cornerstone violated K.S.A. 50-626(b)(8) by filing and maintaining its foreclosure action against the them. They claim that because the transaction was void under K.S.A. 58-4204(h), Cornerstone had no legal basis to pursue foreclosure and, in doing so, engaged in an impermissible debt collection practice allegedly prohibited by K.S.A. 50-626(b)(8).

Obviously, this argument is based on the fact the sale of the manufactured home was void as a matter of law. We have concluded otherwise in our analysis of the first issue discussed in this opinion. Additionally, we have previously set out the provisions of K.S.A. 50-626(b)(8). They make no mention of debt collection practices or the manner in which a seller might exercise its remedies. This claim of the Skinners is also without merit.

Finally, the Skinners argue that Cornerstone's failure to provide the MSO was an unconscionable act under K.S.A. 50-627. Subsection (a) of the statute prohibits unconscionable acts or practices by a supplier in connection with a consumer transaction. Subsection (b) then provides a nonexclusive list of seven circumstances which, if the district court finds are present in a transaction and the supplier knew or had reason to know of them, may result in a determination that the transaction was unconscionable and subject to remedy under the KCPA. The Skinners argue that five of the factors are relevant, but they discuss only three of them.

We first note generally that the failure to deliver the MSO does not appear to be of the type of conduct this statute is intended to protect against. The Kansas comment to the subsection states that it "forbids unconscionable advertising techniques, unconscionable contract terms, and unconscionable debt collection practices." K.S.A. 50-627, comment 1. The statute also protects against the limitation of implied warranties, but application of the statute is generally limited to conduct that fits under one of these categories. See *State ex rel. Stovall v. ConfiMed.com.*, 272 Kan. 1313, 1320-21, 38 P.3d 707 (2002). Cornerstone's actions do not involve any of the above types of conduct, and the Skinners fail to explain how or why the conduct here should be treated as such.

Against the backdrop of this general observation, we turn to the factors under the statute that the Skinners urge us to apply.

They first claim that Cornerstone took advantage of the their inability to reasonably protect their interests because of the Skinners' "physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor" as recognized by K.S.A. 50-627(b)(1). They claim that Cornerstone's failure to deliver the MSO was somehow unconscionable because Cornerstone was an experienced mobile home dealer. However, the statute does not mention the status of the supplier as a factor in determining unconscionability. It refers instead to the supplier's wrongful capitalization of a buyer's weakness. The record here lacks any claims or evidence relating to any infirmity that would put the Skinners in a disadvantageous bargaining position that was

different from any other "average" buyer who was making a purchase from an experienced seller of manufactured homes.

The Skinners assertion under K.S.A. 50-627(b)(2) is also unfounded. That subsection protects against the sale of property at a grossly excessive price when similar property can otherwise be obtained. The Skinners claim that Cornerstone sold them the mobile home at a 63% markup and over-collateralized the loan. Most importantly, the purchase price bears no relation to Cornerstone's failure to provide the MSO. Also, the Skinners provided no evidence that the price or the value of the collateral were unreasonable or that they were excessive in comparison to other mobile home sales.

The Skinners argument under subsection K.S.A. 50-627(b)(3) also falls short. It protects consumers who are "unable to receive a material benefit from the subject of the transaction." K.S.A. 50-627(b)(3). They claim that Cornerstone's failure to provide the MSO resulted in their inability to title the mobile home as a real property and, thus, they did not receive a material benefit of the transaction. Again, the Kansas comment to the subsection is informative. It states that this subsection "includes such conduct as the sale of two expensive vacuum cleaners to two poor families whom the salesman knows, or has reason to know, share the same apartment and the same rug." K.S.A. 50-627, comment 2. The comment indicates that the statute applies to the practical use of property as opposed to legal rights surrounding it. Here, the Skinners clearly had the benefit of owning the manufactured home and living in it as long as they continued to make the payments they agreed to.

The district court correctly ruled that the Skinners' claims against Cornerstone for violations of the KCPA were without merit and that Cornerstone should have judgment against the Skinners.

In conclusion, we do not trivialize or render meaningless the requirement that a supplier of a new mobile home must provide the buyer with the MSO under K.S.A. 58-4204(e). Under the language of the statute, the fact that a supplier fails to do so does not alone void the sale and allow the purchaser to avoid his or her obligations to pay for the home. Nor does that failure to deliver

the MSO alone constitute violations of the KCPA subsections as claimed by the buyers here. The requirement is not without significance, however. It may be that a buyer who proves he or she incurred specific and identifiable damages directly related to the failure of a supplier to provide the MSO has a cause of action based upon the seller's noncompliance with the statutory requirement. But that is not the situation present in this case, and we offer no opinion in that regard.

Affirmed.