**CIMARRON OIL CORP., an Illinois Corporation, Appellant,**

v.

**HOWARD ENERGY CORP., an Illinois Corporation, Appellee.**

No. 26A01–0902–CV–67.

Court of Appeals of Indiana.

July 24, 2009.

J. Robert Kinkle, Hall, Partenheimer & Kinkle, Princeton, IN, Attorney for Appellant.

John E. Rhine, Rhine Ernest LLP, Evansville, IN, Attorney for Appellee.

Charles A. Compton, Jean M. Blanton, Ziemer, Stayman, Weitzel & Houlders, LLP, Evansville, IN, Attorneys for Amici Curiae, Indiana Coal Council, Inc.

Barry A. Macey, Macey, Swanson and Allman, Indianapolis, IN, Attorney for Amici Curiae, United Mine Workers of America and its District 12.

## OPINION

BAILEY, Judge.

### Case Summary

Cimarron Oil Corp. ("Cimarron Oil") appeals the entry of a judgment, pursuant to the Indiana Uniform Declaratory Judgment Act, Ind.Code § 34–14–1–1, *et seq.*, decreeing that lessee Howard Energy Corp. ("Howard Energy"), as opposed to lessee Cimarron Oil, possesses the exclusive right to recover all coal bed methane gas ("CBM") from coal seams underlying the real property of Gletus and Ernestine Hardiman ("the Hardimans") in Gibson County, Indiana. We affirm.

### Issue

Cimarron Oil presents the issue of whether a lease dated October 1, 1976, whereby the Hardimans granted Cimarron Oil's predecessor the right to drill for and produce oil and gas,[1] includes the exclusive right to drill for and produce CBM.

### Facts and Procedural History

On December 1, 2003, Howard Energy filed a complaint for a declaratory judgment, naming as defendants Cimarron Oil and the Hardimans. Argument of counsel was heard on October 10, 2008. Prior to oral argument, Howard Energy and Cimarron Oil submitted an Agreed Statement of Facts to the Gibson Circuit Court. Attachment A to the Agreed Statement of Facts, *Coalbed Methane in Indiana, Occasional Paper 56,* provides background information about CBM generally:

> Methane is a tasteless, odorless, invisible, combustible gas (chemical formula $CH_4$) that occurs naturally in certain rock strata, including almost all coalbeds.

---

1. The Oil and Gas Lease provided in relevant part that Marion Woods was granted a lease "for the sole and only purpose of mining and operating for oil and gas and of laying of pipe lines, and of building tanks, power stations and structures thereon to produce, save and take care of said products[.]" App. 26.

Because it is lighter than air, methane accumulates in underground coal mines in pockets along the roof and in poorly ventilated areas. Miners sometimes refer to methane-rich atmospheres as "firedamp," which has been a dreaded hazard since the 17th Century. Methane explosions are especially destructive when they initiate explosions of coal dust that may propagate through long distances in dust-filled galleries. Tens of thousands of miners have been killed worldwide in explosions, and such tragedies stimulated some of the earliest enactments of social legislation, as well as some of the earliest examples of governmentally supported scientific research (Bryan, 1975). Although much progress has been made, the potential for disaster still exists wherever coal is mined underground. Even mines that have long been abandoned can contain pockets of methane that are a hazard to drilling operations that inadvertently penetrate them.

But this menace to coal miners is also a potential resource. Methane is the principal constituent of natural gas, which is a clean-burning and highly desirable source of energy.

(App.36.) The Agreed Statement of Facts provides in relevant part:

Plaintiff, Howard Energy, is an Illinois Corporation, incorporated in and under the laws of said state, duly registered in the State of Indiana.

Defendant, Cimarron Oil Corp. is an Illinois Corporation, incorporated in and under the laws of said state, duly registered in the State of Indiana.

On or about October 1, 1976, Gletus Hardiman and Ernestine Hardiman were the record owners of the surface and all minerals in a certain tract of property located in the County of Gibson and State of Illinois [sic] described as follows:

60 acres, more or less, lying in the Northwest part of the Northeast Quarter of Section 7, Township 2 South, Range 11 West, the boundaries of which being shown by the public records of Gibson County, Indiana.

Which property is hereinafter referred to as the "Subject Tract."

On or about October 1, 1976, an oil and gas lease covering the Subject Tract was given by Gletus Hardiman and Ernestine Hardiman, as lessors, to Marion W. Woods, as lessee, which lease was duly recorded on October 26, 1976, in the Gibson County Recorder's Office in Miscellaneous Record Drawer 2, Card 8256. This lease remains in force. A copy of said oil and gas lease is attached, marked "Exhibit 1" and is hereby incorporated into and made a part of this statement. It is hereinafter referred to as the "Hardiman Lease."

Cimarron is engaged in, among other things, the business of exploration for oil and gas in the state of Indiana. Cimarron is the current assignee of the Hardiman Lease and possesses the exclusive right of recovery of the minerals underlying the Subject Tract which are covered by the Hardiman Lease.

Howard Energy is engaged in, among other things, the business of exploration for minerals in the state of Indiana. On or about January 30, 2001, a coalbed gas lease covering the Subject Tract was given by Gletus Hardiman and Ernestine Hardiman, as lessors, to Howard Energy, as lessee, which lease was duly recorded on February 1, 2001, in the Gibson County, Indiana Recorder's Office as instrument number 200100000895. This lease remains in force. A copy of said coalbed gas lease is attached, marked "Exhibit 2," and is hereby incorporated into and made a part of this statement. Said lease is

referred to herein as the "Coal Bed Methane Lease."

A controversy exists between Cimarron and Howard energy regarding the right of recovery of coalbed methane from the Subject Tract.

It is the position of Cimarron that it holds the leasehold under the Hardiman Lease; that the Hardiman Lease grants to Cimarron the exclusive right to recover gas; that the right to recover coal bed methane gas is covered by the express provisions of the Hardiman Lease; that Howard Energy's rights to produce coal bed methane from the Subject Tract are subordinate to the rights of Cimarron to produce it; and that any extraction of coal bed methane gas by Howard Energy will constitute a trespass against Cimarron and a conversion of Cimarron's property.

It is the position of Howard energy that coal bed methane is part of the coal estate; that the Hardiman lease is a conventional oil and gas lease covering only the oil and gas estate; that gas, as that term is used in the Hardiman Lease, includes only conventional natural gas and not substances emanating from coal, even if extracted in gas form; that the Hardiman Lease does not therefore include the right to extract coal bed methane; that Howard Energy holds the leasehold under the Coal Bed Methane Lease and has the exclusive right to produce coal bed methane by virtue of that lease; and that Cimarron's claim that it has a right to produce coal bed methane under the Hardiman and similar leases has created uncertainty preventing Howard Energy's undertaking full exploration and sale of coal bed methane in Gibson County and elsewhere.

The publications attached to this Agreed Statement of Facts contain agreed facts concerning coal bed methane and related industries:

a. Harper, D., *Methane in Indiana, Occasional Paper 56,* State of Indiana, Department of Natural Resources, Geological Survey, at Indiana University (Attachment A).

b. Mastalerz, M. and Harper, D., *Coal in Indiana: A Geologic Overview,* Indiana University, Indiana Geological Survey Special Report 60 (Attachment B).

c. Mastalerz, M. Drobnia, A., Rupp, J., and Shaffer, N., *Characterization of Indiana's Coal Resource: Availability of the Reserves, Physical and chemical Properties of the Coal, and Present and Potential Uses,* Open–File Study 04–02, July 2004, Indiana Geological Survey, Indiana University, Sections 5.6, 6.3, 9.0, Table 61 (Attachment C).

Coal bed methane gas is present in all coal and when separately produced, originates from coal. It is in gas form after it is desorbed from the surface in the coal upon release of pressure. Any coal bed methane extracted from the Subject Tract would be in gas form at the well head.

No coal has ever been mined on the Subject Tract. Any production of coal bed methane gas would be from virgin coal seams and would require fracturing the virgin coal seam by use of high pressure in order to stimulate economically viable production of coal bed methane gas. Fissures in coal create space in the coal seam, relieve pressure and thus permit desorption of the $CH_4$ molecule from the surface of the coal into gas form. Fracturing coal may impact the ability to later mine that coal.

In Gibson County, and throughout Indiana and the Illinois Basin, coal mine operations have included handling of coal bed methane which is necessary for the safe operation of coal mines. This

control has generally been exercised for the purpose of venting coal bed methane gas into the atmosphere in order to reduce the danger to coal miners. Until approximately ten years ago, nearly all extraction of coal bed methane gas by the coal owner or lessee has been for that purpose, there being only limited and sporadic commercial sale of such gas by the coal bed methane owner and such sales generally being secondary to coal extraction operations.

Approximately ten years ago, coal bed methane gas production unrelated to coal mining began in Sullivan County, Indiana, which is near Gibson County. This production has resulted in continuing commercial sales of coal bed methane gas. The producer of coal bed methane gas in Sullivan County, Indiana claims it has the right to produce the gas and does so on the basis of its control of the coal estate. It does not control the oil and gas estate. This field is hereafter referred to as the "Dugger Field."

Maria D. Masterlerz, Ph.D., Research Scientist, Indiana University, Indiana Geological Survey, and John A. Rupp, Assistant Director for Research, Indiana University, Indiana Geological Survey, are experts on coal bed methane. Further information regarding the qualifications of these experts are attached as Attachments D and E.

Dr. Mastalerz is an expert in the field of coal bed methane. She has stated the following to counsel for both parties, as a supplement to and analysis of her statements in the above publications, and it is presented to the court in lieu of her expert testimony:

There are two types of Coal Bed Methane Gas ("CBM Gas"): Biogenic and Thermogenic. The Biogenic CBM Gas is formed when bacteria reaches coal through the water systems, feeds on coal and generates gas which adsorbs to the coal. Thermogenic CBM Gas is formed by long term pressures which chemically produces [sic] the CBM Gas. Most CBM Gas, including all in Indiana, is Biogenic in origin. CBM gas is composed almost entirely of $CH_4$. The $CH_4$ is located within the coalbed and is an integral part of the coal, where it primarily attaches itself to the surface of pores in the coal. It is released, in gas form, when exposed to a free space allowing desorption from the coal. Small amounts of $CH_4$ may exist in free gas form within a pore or fracture system in the coal but most exists within the solid matrix of the coal and is released during production by fracturing the coal seam to create open spaces into which the $CH_4$ may desorb from the pores. The origin of coal bed methane is bacterial action on the organic material from which the coal was formed. It remains in the coal until it is separated by desorption, generally by artificial means such as mining (creating entries or open spaces) or fracturing for purposes of pre-mining degasification (for safety) or for CBM Gas production, whereupon it is in free gas form. The gas in shale is generally produced in the same manner as gas in coal.

John A. Rupp is agreed to be an expert in the field of coal bed methane, has stated the following to counsel for both parties, as a supplement to and analysis of his statements in the above publications, and it is presented to the court in lieu of his expert testimony:

He concurs in the statements of Dr. Mastalerz. Most $CH_4$ does not exist in free gas form in virgin coal seams. Conventional natural gas, from gas fields long existing in Indiana, is all in free gas form and is in a non-organic matrix (and, limestone, etc.). The process of desorption, that is, the $CH_4$ molecule coming off the solid material, is

caused by a drop in hydrostatic pressure.

Chemically, the gas molecule in "conventional gas" is essentially [the] same as the gas molecule present in coalbed methane. It is hereinafter referred to as the "CH4 molecule." The molecule of CH4 is formed as the result of bacterial action on organic matter in the coal or shale formations or some other organic substance present in the surface of the earth. The difference in the physical characteristics of coal bed methane (hereinafter "CBM") and shale gas and free gas ("conventional gas") is illustrated in the attached diagram and marked Exhibit "3." Gas in coal and shale formations in Indiana is the same as conventional gas and almost all formed by the biogenic process. If the gas is formed in coal or shale, the CH4 molecule generally attaches itself to the surface of the pores within the coal or shale bed. See Illustration A on Exhibit "3." Even in coal there is a small percentage of free gas, i.e. gas that has not attached itself to the surface of the pore in the coal. This mechanism of the gas molecule attaching itself to the surface of the pores in the coal is called adsorption. Conventional gas is also formed by the reaction of bacteria on organic matter. However, the formed gas flows through seams, fractures and other voids in the material where it was formed and collects in voids in rocks such as limestone or sandstone. The gas molecules do not attach themselves to the surface of the pores in these formations. This is illustrated by the diagram labeled B in Exhibit "3." Conventional oil or gas is free to flow out, usually under pressure, without the necessity of being desorbed from the rock formation.

Indiana is one of two states that does not require reports of produced volume of CBM Gas. It is known that CBM wells are low yield worldwide, generally each well yields only 30 to 80 mcf (thousand cubic feet) per day. Most produce a substantial amount of water, which must be removed by lengthy dewatering procedures before optimum production is achieved. CBM Gas, like conventional natural gas, must be pressurized and piped to a user and usually must be treated to reach pipeline quality. All of these factors mean that many wells are needed for a CBM Gas field to be economically viable. It is not economically viable to drill and produce one, or a few, coal bed methane gas wells because the amount of production will not sustain the high infrastructure costs for gathering, pressurization, treatment and transportation. The Dugger Field has for nearly ten years been the only commercial CBM Gas production field in Indiana. It contains approximately 37 wells, produces 1 to 2 million cubic feet per day and taps into a nearby gas trunkline at a pressurization station. There are 9,000 acres currently in production in the Dugger Field. It handles waste water with specialized injection wells on site. It also has a purification plant for the purpose of removing nitrogen. One of the reasons for slow development of coal bed methane production in Indiana is uncertainty over the right to produce it between owners of coal and owners of conventional oil and gas or their lessees.

At the time the Hardiman Lease was executed, the parties did not contemplate the possibility of gas production, from the coal strata, nor did they contemplate prohibition of such production. For this reason, either the intent of the individual parties to the lease with regard to authority to produce coal bed methane is unknown and indeterminable or there was no intent either way, the matter not being contemplated by the parties.

There has been mineral production in Gibson County, Indiana, for over a century. Minerals underlying land have economic value independent of the surface of the land and are often severed from the surface of the land. Over time, this has resulted in fractionalized ownership of the oil and gas estate in Indiana on a large percentage of property which is located in the mineral producing regions of Indiana.

Fractionalized ownership of the coal estate also exists in the mineral producing regions of Indiana but to a lesser extent than oil and gas ownership. A single oil well or small oil bearing property may yield economically viable production. Coal mines require assembly of large areas of coal reserves. For this reason, there exists in Gibson County and elsewhere in Indiana large areas where control of coal reserves is consolidated into one entity.

There are producers currently in southern Indiana attempting to assemble large land areas to produce gas from the New Albany Shale Formations.

(App.16–24.)

On January 12, 2009, the trial court issued its findings of fact, conclusions of law, and order. The trial court's order addressed the presumed intent of the parties, relevant public policy, and persuasive authority of other jurisdictions, stating in relevant part:

There can be no higher goal of our state's public policy than protection of Indiana coal miners from one of the oldest and most threatening danger to miners—a methane gas explosion.... The property before the court is very near an active underground coal mine here in Gibson County and it was in this county that some of the nation's most deadly CBM mine explosions have occurred. To now take control of CBM away from the coal mine operator would

not serve the public's interest. Coal producing states in the Eastern basins, where coal is mined underground, have special concerns relating to CBM production. In West Virginia, that state's Supreme Court held that the parties could not have intended to include oil and gas [sic?] in a conventional oil and gas lease because such a grant would include the right to invade coal seams and make them more difficult and dangerous to later produce coal—this could not reasonably have been the parties' intent in a state that produces coal from underground mines.... This Court feels that the same could be said for the parties in Gibson County, Indiana. Production of the gas on this property would require fracturing the coal seam, impacting the ability to later mine the coal. Absent an express statement, the Court does not think any owner of coal would have intended to grant, as a consequence of his oil and gas grant, the right to seriously damage his valuable coal seam, nor does the Court think the lessee intended to acquire such a right.

(App.10–11.) (internal citations omitted). Ultimately, the trial court issued a declaratory judgment in favor of Howard Energy, concluding, "CBM is part of the coal estate and no interest in CBM passed by reason of the 1976 oil and gas lease." (App.10.) Cimarron Oil now appeals.

### Discussion and Decision

#### I. Standard of Review

This case involves the interpretation of a lease; no factual disputes were presented for resolution by the trial court. The construction of a written contract, such as a lease, is a pure question of law. *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC,* 870 N.E.2d 494, 500 (Ind.Ct.App.2007). We review *de novo* such questions of law. *Allstate Ins. Co. v. Bradtmueller,* 715

N.E.2d 993, 996 (Ind.Ct.App.1999), *trans. denied.*

## II. Analysis

 The parties have agreed that neither contemplated in 1976 that technological advances would permit production of CBM for commercial gain. Accordingly, there was no explicit written expression of intent to either grant or reserve the right to drill for and produce CBM. We are asked by the parties to determine presumed intent as a matter of law.

When considering the presumed or surmised intent in the grant of oil and gas leases pre-dating the current technology of commercial CBM production, courts of other jurisdictions have reached divergent conclusions, with CBM alternately considered part of the coal bed estate, part of the oil and gas estate, or a distinct mineral estate. The earliest such case arose in Pennsylvania, a state with a long history of substantial coal production. *See U.S. Steel Corp. v. Hoge,* 503 Pa. 140, 468 A.2d 1380 (1983).

*Hoge* involved a surface owner's deed of coal, with a specific reservation of "the right to drill and operate through said coal for oil and gas." *Id.* at 144, 468 A.2d at 1382. The Court found adsorbed or physically intertwined CBM [2] to be part of the coal estate as opposed to the gas and oil estate, declaring, "the coal owner may mine his coal, extract the gas from it, or both." *Id.* at 148, 468 A.2d at 1384. Upon its examination of the severance deed in question for evidence of the parties' intent, the Court recognized that the parties were concerned with that which was "commer-

cially exploitable" at the time of the deed and that the grantor would not have intended to reserve the right to extract a "valueless waste product." *Id.* at 150, 468 A.2d at 1385. Ultimately, the *Hoge* Court held: "the reservation intended only a right to drill through the seam to reach the unconveyed oil and natural gas generally found in strata deeper than the coal." *Id.*[3]

Jurisdictions subsequently addressing CBM ownership reached varying results. *See Cont. Res. of Illinois, Inc. v. Illinois Methane, LLC,* 364 Ill.App.3d 691, 693, 301 Ill.Dec. 887, 847 N.E.2d 897, 900 (2006) (observing "No one answer is right for every state and/or every lease or grant" and ultimately concluding that CBM found in coal seams and/or in mine voids is controlled by the coal estate); *Harrison–Wyatt, LLC v. Ratliff,* 267 Va. 549, 556, 593 S.E.2d 234, 238 (2004) (where parties to the deed of coal could not have contemplated CBM would become a valuable energy source, surface owners retained the right to produce CBM); *Energy Dev. Corp. v. Moss,* 214 W.Va. 577, 591 S.E.2d 135 (2003) (in the absence of specific language to the contrary or other indicia of intent, a 1986 standard oil and gas lease did not permit leaseholder's invasion of the coal bed to recover CBM)[4]; *NCNB Texas Nat'l Bank, N.A. v. West,* 631 So.2d 212, 229 (Ala.1993) (finding, in the absence of clear contrary intent, ownership is dependent on location at the time the gas is captured, with the coal owner owning CBM recovered from wells drilled directly into coal beds and having the right to

---

**2.** Adsorbed CBM is present in the coal strata, adhered in a thin layer of molecules. Pursuant to the "capture rule," CBM gas that has escaped the coal strata may be captured by the gas estate holder. *Hoge,* 503 Pa. at 147, 468 A.2d at 1383.

**3.** The *Hoge* Court referred to "natural gas" as that "generally found in strata deeper than

coal veins, though it shares many of the characteristics of coalbed gas." *Hoge,* 503 Pa. at 145, 468 A.2d at 1382.

**4.** As CBM commercial production developed, West Virginia enacted the West Virginia Coalbed Methane Act, W. Va.Code § 22–21–1, et seq. (1994).

recover *in situ* gas found in the coal seam, and the gas owner having rights to CBM that migrated out of the coal seams). *But see Amoco Prod. Co. v. S. Ute Indian Tribe,* 526 U.S. 865, 119 S.Ct. 1719, 144 L.Ed.2d 22 (1999) (surface patentees, not the Indian tribe holding equitable title to reserved coal, owned CBM because the term "coal" in the 1909 and 1910 Acts did not encompass CBM); *Cent. Nat. Res., Inc. v. Davis Operating Co.,* 288 Kan. 234, 244, 201 P.3d 680, 687 (2009) (declining to adopt an "artificial rule" of "first severance/container theory," rejecting assertion that CBM is "part and parcel of the coal estate," and focusing on actual agreement); *Newman v. RAG Wyoming Land Co.,* 53 P.3d 540, 550 (Wyo.2002) (Considering unambiguous language of the deed, "Coalbed methane, being a gas, remained the landowners' property"); *Caballo Coal Co. v. Fidelity Exploration & Prod. Co.,* 84 P.3d 311, 319–20 (Wyo.2004) (acknowledging that *Newman* recognized CBM to be a gas, but declaring that the deed under consideration was dissimilar to that of *Newman,* intent was the key, and a grant conveying all minerals associated with deposits of coal included CBM); and *Carbon County v. Union Reserve Coal Co.,* 271 Mont. 459, 474, 898 P.2d 680, 689 (1995) (applying an ownership in place rule, with the gas developer having the right to drill for and produce CBM and the coal operator having a simultaneous right to capture CBM for safety purposes incident to coal mining operations).

For the most part, the decisions of other jurisdictions have avoided a flat declaration that CBM is either "coal" or "gas." Here, the trial court essentially followed the so-called "eastern rule," that is, CBM is a component of coal, and ultimately determined that, because public policy dictates optimal mining safety, CBM production and coal mining are best left in the control of a single entity. Cimarron now urges our adoption of the so-called "western rule," that is, the holder of a broadly-defined gas and oil estate may have rights to CBM, which is a form of gas.[5] Regardless of the application of the "eastern rule" or "western rule," the various cases have in common the primary focus on intent, and most refuse to recognize the silent conveyance of a mineral interest in a deed or lease, construed as of the date of its execution.

■ Focusing upon the contract language used in this case, it is clear that there was no contemplation of profitable CBM production. The gas estate owner was not granted permission to invade the coal seam. Further, Agreed Finding of Fact No. 12 provides that "Any production of coal bed methane gas would be from virgin coal seams and would require fracturing the virgin coal seam by use of high pressure in order to stimulate economically viable production of coal bed methane gas." (App.19.) The Hardimans did not explicitly agree to Cimarron's invasion of the coal bed in this manner; it is not reasonable to presume that the intent was to permit invasion of a valuable land asset, the coal bed, should a means of making profits arise in the future. As observed by the *Moss* Court: "a court will not find an implied right to conduct a given activity (not mentioned in the lease) unless that activity is clearly demonstrated to have been a common practice in the area, at the

---

5. Cimarron notes that Indiana property law broadly defines "oil and gas." Indiana Code Section 32–23–7–2 (2002) defines "oil and gas" as meaning "petroleum and mineral oils and gaseous substances of whatever character naturally lying or found beneath the surface of land." Nevertheless, the 1976 lease executed between the Hardimans and Cimarron's predecessor-in-interest did not reference a statutory provision.

time of the lease's execution." *Moss,* 214 W.Va. at 587, 591 S.E.2d at 145.

We do not find that the adoption of a regional rule is necessary to disposition of this particular case, where lack of intent to convey CBM rights to Cimarron's predecessor is apparent. That said, we agree with the trial court that public policy would militate toward considering CBM to be part of the coal bed. CBM is derivative of the coal and, traditionally, coal mining operations have dealt with removing CBM with miner safety as the foremost concern. Public safety would be disserved by pitting the miner who needs to dissipate CBM to prevent explosions against the gas estate owner whose financial resource is being depleted. Nevertheless, it is within the province of the Legislature, to which we defer, to make policy decisions.

### Conclusion

The Cimarron lease does not convey a right to the gas estate holder to invade the coal seams to produce CBM. The Hardimans retained the rights to CBM production, which they conveyed to Howard Oil. The trial court properly concluded that Howard Oil, as opposed to Cimarron Oil, could produce CBM on the subject property.

Affirmed.

DARDEN, J., and ROBB, J., concur.