No. 118,981

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

COMMUNITY FIRST NATIONAL BANK,
A Corporation Existing Under the Laws of the United States of America,
*Appellee*,

v.

SARAH GRACE NICHOLS, aka SARA GRACE LILLICH, aka SARAH LILLICH,
and KURTIS LEE NICHOLS,
*Appellants*.

SYLLABUS BY THE COURT

Banks are not included in the definition of supplier under the Kansas Consumer Protection Act (KCPA) if the bank is subject to state or federal regulation related to disposition of repossessed collateral.

Appeal from Wabaunsee District Court; JEFFREY R. ELDER, judge. Opinion filed May 10, 2019. Affirmed.

*Tai J. Vokins* and *Krystal L. Vokins*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Lawrence, for appellants.

*David P. Troup* and *Melissa D. Richards*, of Weary Davis, L.C., of Junction City, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON, J., and MCANANY, S.J.

ARNOLD-BURGER, C.J.:  This case involves the foreclosure of two mortgages. Sarah Grace Nichols and Kurtis Lee Nichols (the Nichols) obtained two home loans from Community First National Bank (CFNB) and granted CFNB mortgages on the homes they purchased. When the Nichols failed to make payments on the loans, CFNB filed this

1

foreclosure action. The Nichols made several counterclaims, which raised various violations of the Kansas Consumer Protection Act, Kansas Uniform Consumer Credit Code, and common-law claims. The district court granted judgment in favor of CFNB and denied the Nichols' counterclaims. The Nichols appealed and make several arguments on appeal. Finding no reversible error we affirm.

FACTUAL AND PROCEDURAL HISTORY

This case involves the foreclosure of two mortgages encumbering two houses located in Wabaunsee County, Kansas.

CFNB is a national banking association. In April 2010, the Nichols obtained a $36,000 loan from CFNB to purchase a home on Main Street in Alta Vista (Home 1). The parties executed a promissory note, designated Loan Number 32254 (2010 Loan). The 2010 Loan was a variable interest loan, with the interest rate initially set at 7.5%. Interest was to accrue on an "Actual/365" basis. Payments for the loan were due on the 15th of each month. Payments received more than 15 days after the payment due date were subject to a late charge equaling 5% of the unpaid amount, up to a maximum of $25.00. In total, the loan was estimated to require 179 monthly payments of $333.79. However, due to the variable interest rate, the promissory note stated that this amount may change after the 36th payment. The Nichols assigned CFNB a mortgage on the house they purchased to secure the loan.

The Nichols' first payment was due on May 15, 2010. However, they did not pay until May 27, 2010—late but within the grace period. Their next payment was 29 days late—outside the grace period. The pattern of late payments continued. By February 2014, the Nichols had made 40 payments and all but one payment was late. Many of these late payments fell within the 15-day grace period. But some were made more than

2

15 days after the due date. CFNB assessed late charges on most, but not all, of the late payments.

About six months after the loan was signed, in December 2010, CFNB's audit department determined that the 7.5% interest rate was too high. CFNB thought it was legally required to lower the interest rate to 6.25%. To rectify this mistake, the parties executed a new promissory note in January 2011. CFNB backdated the note to the original note date and recalculated the amount that the Nichols should have been paying. This resulted in a $370.20 credit towards interest. CFNB applied the credit to the Nichols' bill due on February 15, 2011. CFNB later discovered that it incorrectly interpreted the law, and that the 7.5% interest rate was not illegal. However, CFNB continued to honor the 6.25% interest rate provided for in the new promissory note.

In May 2011, CFNB discovered what it believed to be another error. Until that point, CFNB had been applying the Nichols' payments on a "bill date to bill date" basis. This meant that the Nichols' payments were applied to the principal and to interest accrued between bill dates. For example, their August 15, 2010 bill was for principal and for interest accrued from July 15 through August 15, 2010. Even though they did not pay the August 15, 2010 bill until August 27, 2010, their payment was applied to the interest gained during the bill period and then to principal. Robert Stitt Jr., president of CFNB, believed that because the loan was an Actual/365 loan, the bill date to bill date payment application method was incorrect. Stitt opined that the payments should have been applied to interest accrued between payment dates, not bill dates. After May 2011, CFNB began applying the Nichols' payments on a payment date to payment date basis. The Nichols' prior payment date had been May 31, 2011. Their June bill, due June 15, 2011, showed that they needed to pay interest accrued between May 31 and June 15. However, because they did not pay their June bill until June 30, their payment was applied to interest accrued between May 31 and June 30, and then it was applied to principal. Each payment after this was applied on a payment date to payment date basis.

3

In early 2012, the Nichols decided to buy a bigger house on Main Street (Home 2) in Alta Vista to accommodate their growing family. Kurtis contacted CFNB to discuss obtaining a new loan to finance the purchase. Kurtis testified that he asked CFNB if they could combine his existing loan and the new loan into a 30-year mortgage because he did not think they could afford to make two payments on two 15-year mortgages. Jay Terrill, vice president of CFNB, denied that the Nichols requested a 30-year note. Ultimately, the Nichols borrowed an additional $38,000 and agreed to a 15-year mortgage, designated Loan Number 32410 (2012 Loan). The 2012 Loan had a lower interest rate, 5.5%, than the 2010 Loan. The terms regarding interest accrual and late fees were the same. The parties executed the promissory note for the loan in March 2012.

At the time the Nichols got their new house, they intended to rent their old house to a family member. However, that did not occur. The Nichols failed to make payments on the 2010 Loan, so CFNB sent them a notice of right to cure default. The Nichols asked CFNB for a deferral on the 2010 Loan to allow them time to look for another renter. In June 2012, CFNB agreed to defer payment for two months. The deferral agreement stated that the $502.10 payments due on May 15, 2012, and June 15, 2012, would be deferred to the maturity of the note in April 2025. The Nichols would have to pay $200 towards escrow on June 29, 2012, and their next regularly scheduled payment of $502.10 would be on July 15, 2012. The deferral agreement stated that "[e]xcept as specifically amended by this agreement, all other terms of the original obligation remain in effect."

The Nichols were unable to rent or sell Home 1 by the end of the deferral agreement. So, they entered into a second deferral agreement with CFNB for the 2010 Loan. In the second deferral agreement, CFNB agreed to defer four payments due between July 2012 and October 2012. On the same day, the parties executed a deferral agreement for the 2012 Loan under which CFNB agreed to defer the Nichols' August and September payments until the maturity of the note in April 2027.

4

The Nichols resumed their payments at the end of the deferral period. They contacted CFNB, confused as to why their payments were only being applied to interest. Terrill explained that they were paying the interest that accrued during the deferral period. The Nichols believed that the extension agreements stopped interest from accruing.

Kurtis met with Terrill at the bank in June 2013. Kurtis had just noticed how CFNB handled the $370.20 credit it had granted him after recalculating the interest rate, and Kurtis disagreed with how CFNB applied the credit. Several people at the bank spent two days calculating by hand the effect of the reduced interest rate. They concluded that the Nichols were billed appropriately. But, the Nichols continued to disagree.

On August 15, 2013, the Nichols filed a complaint with the Office of the Comptroller of Currency (OCC). They did not agree with the way CFNB handled the $370.20 credit it granted them after changing the interest rate from 7.5% to 6.25%. They also thought CFNB inappropriately allowed interest to accrue on the loans during the deferral periods.

Unaware of the OCC complaint, CFNB sent the Nichols a letter on August 23, 2013, to address the disputed accounting. CFNB explained again how it applied the $370.20 credit. Then, CFNB addressed the Nichols concern that interest accumulated during the deferral period. CFNB disputed that it agreed to defer interest accumulation during the period, explaining that it only deferred the Nichols' obligation to make payments on the interest and principal. In order to accommodate the misunderstanding, CFNB offered the Nichols a $958.58 credit to offset the interest that accrued during the deferral period. To conclude the letter, CFNB reminded the Nichols that they were past due by four months on the 2010 Loan and by two months on the 2012 Loan. It threatened to begin the collection process if the Nichols did not pay all of their past due payments.

5

Due to what the Nichols believed was a deteriorating relationship with the bank, they stopped making payments on the loans. On March 24, 2014, CFNB's attorneys sent the Nichols a letter stating that CFNB had referred the Nichols' loans to them for foreclosure. The letter informed the Nichols that they were in default on both of their loans and that CFNB had chosen to accelerate the amounts due. At the time, the Nichols owed $33,359.40 on the 2010 Loan and $37,273.39 on the 2012 Loan. The Nichols were also delinquent on a checking reserve overdraft line and overdrawn on a checking account.

On April 2, 2014, Kurtis brought cash to the bank with the intention of making his past due payments. According to Kurtis, he asked the bank teller how much he owed on each loan and paid that amount for a total payment of $5,855.94. Kurtis received four receipts from the transaction. One stated that $3,152.74 was applied to the 2010 Loan. The other three showed various amounts paid toward the 2012 Loan:  $2,500.00, $47.26, and $155.94.

Several days later the bank sent the Nichols a letter acknowledging the payment and informing them that they were still past due on both of the notes. The letter stated that the bank applied the $5,885.94 as follows:

| | |
|---|---|
| Pay off of unrelated account | $337.79 |
| Payments due for [2010 Loan] | $2,693.40 |
| Late charges for [2010 Loan] | $202.05 |
| Payments due for [2012 Loan] | $2,401.70 |
| Late charges for [2012 Loan] | $221.00 |
| Total | $5,855.94 |

6

The way that the payment was allocated left the Nichols owing $459.34 on the 2010 Loan and $301.50 due on 2012 Loan. CFNB directed the Nichols to catch up on the payments in full in order to avoid foreclosure.

At trial, CFNB admitted that the bank did not apply the $5,855.94 as Kurtis directed the teller. Terrill explained that bank tellers do not have the authority to apply payments. When the payment was accepted, it went to the loan operations department. The loan operations department discovered a special warning on the loans, and asked Stitt how they should apply the payments that Kurtis made. Stitt was unaware of the conversation that Kurtis had with the bank teller. Stitt did not immediately inform the Nichols that he changed the way the payments were applied until the letter sent several days later.

The Nichols never responded to CFNB's letter. They stopped making payments on the loans. This prompted CFNB to file a petition against the Nichols on May 11, 2015—over a year after their last payment. CFNB asked the court to order the Nichols to pay the full principal balance, interest, escrow, and late charges accrued on each loan. It also asked the court for leave to foreclose against the two properties subject to the mortgages.

In their answer, the Nichols alleged that CFNB was the first party to breach the agreements, and that CFNB's breach of contract excused the Nichols' obligations under the contract. The Nichols also made several counterclaims, including breach of contract, breach of duty of good faith and fair dealing, several Kansas Consumer Protection Act (KCPA) violations, and Kansas Uniform Consumer Credit Code (UCCC) violations.

CFNB filed a motion for partial summary judgment arguing that it was not subject to the KCPA. The KCPA prohibits suppliers from engaging in deceptive acts or practices or from engaging in unconscionable acts or practices in connection with a consumer transaction. K.S.A. 2018 Supp. 50-626; K.S.A. 50-627. The Act defines "supplier" as:

"a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer. Supplier does not include any bank, trust company or lending institution which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank, trust company or lending institution." K.S.A. 2018 Supp. 50-624(l).

CFNB argued that it was not a supplier as defined by the KCPA because it is a bank subject to state or federal regulation with regard to disposition of repossessed collateral.

The district court granted CFNB's motion for partial summary judgment. It dismissed all of the Nichols' counterclaims brought under the KCPA, holding that CFNB was not a supplier within the meaning of the Act. The district court also granted judgment in favor of CFNB in the amount of $37,330.96 plus any interest accrued after August 30, 2016, for the 2010 Loan and $40,543.46 plus interest accrued after August 30, 2016, for the 2012 Loan. The district court did not include late fees in its award. The court also granted CFNB's foreclosure claims and allowed them to begin the foreclosure process.

The Nichols' counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, violations of the UCCC, and fraud proceeded to trial by the court. As explained more fully below, at the conclusion of the trial, the district court granted judgment in favor of CFNB on all claims.

The Nichols appealed.

ANALYSIS

*The district court did not err in holding that CFNB was not a supplier as defined in the KCPA.*

The Nichols' first argument is that the district court erred when it held that CFNB was not a "supplier" as defined by the KCPA.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the Legislature's intent. 304 Kan. at 409.

The Kansas Legislature enacted the KCPA in 1973 with the objective of "protect[ing] consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. 50-623(b). The KCPA is to be construed liberally to promote this policy. *Stair v. Gaylord*, 232 Kan. 765, 775, 659 P.2d 178 (1983).

The KCPA prohibits suppliers from engaging in deceptive acts or practices or from engaging in unconscionable acts or practices in connection with a consumer transaction. K.S.A. 2018 Supp. 50-626; K.S.A. 50-627. The Act defines "supplier" as:

"a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer. *Supplier does not include any bank, trust company or lending institution which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank, trust company or lending institution.*" (Emphasis added.) K.S.A. 2018 Supp. 50-624(l).

The district court held that CFNB was not a supplier because, as a national banking association, it is subject to state or federal regulations with regard to disposition of collateral. The parties dispute whether CFNB is a supplier within the meaning of the statute.

The Nichols argue that the exception in the definition of supplier should be narrowly construed. They assert that banks should be considered suppliers unless the consumer transaction at issue relates to disposition of repossessed collateral. Interpreting the statute to exempt all banks subject to state or federal regulations, the Nichols argue, would render the phrase "with regard to disposition of repossessed collateral by such bank" meaningless. They also assert that the legislative history of the statute supports a narrow interpretation of the exclusion.

The language at issue was added to the definition of supplier in 2005. L. 2005, ch. 22, § 1. The key is whether the language "with regard to disposition of repossessed collateral by such bank" defines banks or limits the exemption from the definition of supplier to banks only when they are disposing of repossessed collateral. L. 2005, ch. 22, § 1.

Federal courts have examined whether banks are excluded from the KCPA. The federal bankruptcy court for the District of Kansas examined these cases and concluded that "[i]n every instance where a bank's status as 'supplier' under the KCPA was directly before it, the United States District Courts have held that regulated banks are excluded

10

from the definition, regardless of whether the case actually involves a disposition of repossessed collateral." *In re Larkin*, 553 B.R. 428, 444 (Bankr. D. Kan. 2016); see *Kalebaugh v. Cohen, McNeile & Pappas, P.C.*, 76 F. Supp. 3d 1251, 1260 (D. Kan. 2015) (holding that "Discover Bank is not a supplier under the KCPA if it is subject to state or federal regulation"); *Kastner v. Intrust Bank*, No. 10-1012-EFM 2011 WL 721483, at *2 n.3 (D. Kan. 2011) (unpublished opinion) (noting that "K.S.A. § 50-624(l) appears to exclude banks and lending institutions that are subject to state and federal regulation from the definition of 'supplier'").

In *Larkin*, Judge Robert E. Nugent, citing to grammar treatises and Bryan Garner's Manual on Legal Style, described the grammatical makeup of the provision as indicative of a blanket exclusion.

> "[T]he 'subject to state or federal regulation' exclusion is introduced by the relative pronoun 'which,' a word that is usually employed to introduce a non-restrictive or independent clause. Here, 'which' refers to the words 'any bank, trust company or lending institution.' As various grammarians note, an independent clause is one whose removal from a sentence does not change the sentence's meaning. Thus, the 'which' clause does not restrict or condition the exclusion of these institutions from being 'suppliers.' Even if it did, nearly every secured creditor's conduct in connection with the disposition of repossessed collateral is at a minimum governed by the Kansas Uniform Commercial Code and the Kansas Uniform Consumer Credit Code, two detailed and integrated schemes of state regulation." 553 B.R. at 443.

In *Kalebaugh*, Judge Thomas Marten found no legal support—"statutory or otherwise"— for the plaintiff's contention that a bank was a supplier under the KCPA for all purposes except when dealing with repossessed collateral. 76 F. Supp. 2d at 1260.

But "a Kansas state court is not bound by a federal court's interpretation of Kansas law, and our Supreme Court is the final authority on Kansas law for all state and federal courts." *Bonura v. Sifers*, 39 Kan. App. 2d 617, 635, 181 P.3d 1277 (2008). The Nichols

ask this court to interpret the statute more narrowly than the federal courts. They assert that this court has already "disposed of the 'blanket exemption' argument by examining the facts at issue, and holding banks *are* suppliers under the KCPA, except in cases dealing with the 'disposition of repossessed collateral.'" In support of their argument, they cite *Kahn v. Denison State Bank*, No. 113,248, 2016 WL 687728 (Kan. App. 2016) (unpublished opinion). Although it is an unpublished opinion, we will further examine the *Kahn* case.

In *Kahn*, Terry Lee Kahn purchased a house from Denison State Bank (the Bank). Kahn gave the Bank a mortgage on the home as well as her personal residence. Kahn later sued the Bank alleging, among other things, that the Bank violated the KCPA. The district court granted the Bank's motion to dismiss, and Kahn appealed. The Bank argued that it was not a supplier as defined by the KCPA because the home it sold was repossessed collateral. 2016 WL 687728, at *8. This court found that the home was not repossessed collateral. Then, without further analysis, this court concluded that the Bank qualified as a supplier under the KCPA. 2016 WL 687728, at *8.

This court later distinguished *Kahn* in *White v. Security State Bank*, No. 115,179, 2017 WL 5507943, at *7 (Kan. App. 2017) (unpublished opinion). In *White*, Kyle and Sharene White sued Security State Bank (the Bank) to resolve a dispute over a note and mortgage transaction between the parties. The Whites alleged that the Bank violated the KCPA. The district court dismissed the Whites' KCPA claims, holding that the Bank was not a supplier under the KCPA because it is subject to regulation. The Whites appealed. This court believed that "[t]he critical issue is whether the exclusion in the KCPA for regulated banks applies to the Whites' loan transaction since there was no repossessed collateral at issue." 2017 WL 5507943, at *6. As in this case, the Whites argued that banks were only exempted from application of the KCPA when the bank is actually disposing of repossessed collateral. The Bank made the same argument as CFNB makes

12

here—that the KCPA exclusion applies to regulated banks regardless of the nature of the transaction.

The Whites relied on *Kahn* to support their argument. However, this court rejected the comparison. 2017 WL 5507943, at *7. It stated:

"The Whites point out that our court in [*Kahn*] . . . ruled that a bank which sold real estate was a supplier under the KCPA because it did not repossess the property it sold, but rather repurchased it as part of a settlement of a lawsuit the property owner had against the bank. 2016 WL 687728, at *8.

"From our reading of [*Kahn*], however, it is unclear whether the issue of statutory construction which is presented to our court in this case was raised before our court in [*Kahn*]. On the contrary, it appears the bank's argument was that the property at issue in [*Kahn*] was, in fact, repossessed property which put the bank squarely within the ambit of the exclusion. [Kahn], on the other hand, challenged that characterization and argued that the property was not repossessed property but simply property obtained by the bank as part of a civil settlement. In other words, it does not appear the bank ever broadly argued (as the Bank contends here) that it should come under the KCPA exclusion simply because it was, in a general sense, a regulated bank in matters relating to the disposition of repossessed collateral. In short, we question whether [*Kahn*] really addressed the legal issue before us in this appeal.

"Additionally, our court's holding in [*Kahn*] was brief, without any statutory interpretation of K.S.A. 2016 Supp. 50-624(l), and limited to a review of the district court's factual determination that the property in question was collateral. See 2016 WL 687728. Given these circumstances and given that unpublished opinions are not binding precedent and are only cited for persuasive authority, we do not consider [*Kahn*'s] ruling dispositive or persuasive on the particular legal question before us in this appeal. See Kansas Supreme Court Rule 7.04(g)(2)(A) and (B) (2017 Kan. S. Ct. R. 45)." 2017 WL 5507943, at *7.

13

This court then examined federal decisions regarding the statute, specifically *Larkin* and *Kalebaugh*. *White*, 2017 WL 5507943, at *7-8. As discussed above, the federal courts have held that the KCPA does not apply to regulated banks. Ultimately, this court ruled in favor of the Bank, holding that the plain language of the KCPA provides that "if a bank is generally subject to regulations pertaining to disposition of repossessed collateral, the bank is excluded as a supplier under the nomenclature and reach of the KCPA." 2017 WL 5507943, at *7.

We find the reasoning in *White* is more convincing and relevant to deciding the issue in this case than the *Kahn* decision. The plain text of the KCPA states that banks are not included in the definition of supplier if the bank is subject to state or federal regulation related to disposition of repossessed collateral. Because the statute is unambiguous, this "court does not need to speculate further about legislative intent and, likewise, the court need not resort to canons of statutory construction or legislative history." *State v. Coman*, 294 Kan. 84, 92, 273 P.3d 701 (2012). The Nichols do not dispute that CFNB is a bank subject to regulation. Therefore, the district court's decision that CFNB is not a supplier as defined by the KCPA was not error. If the Legislature deems this to be contrary to its intention, it is free to change the statute to reflect its intention. We simply interpret the words as they are currently written.

*CFNB's transition from applying the Nichols' payments from "bill date to bill date" to "payment date to payment date" did not constitute fraud, breach of contract, or a violation of the KCPA.*

Next, the Nichols argue that the district court erred in holding that CFNB did not violate the law in changing the date it applied their payments from "bill date to bill date" to "payment date to payment date." The Nichols allege that CFNB's actions constituted fraud, breach of contract, and a violation of the KCPA. As discussed in the previous

14

section, CFNB is not subject to the KCPA. Thus, we will only address the fraud and breach of contract claims.

CFNB asserted that it changed the manner in which it applied the Nichols' payments because the loan was an "Actual/365" loan, also called a 365/365 loan. During his testimony, Stitt contrasted the Actual/365 loan with a 360/360 loan, which he also called a scheduled or periodic loan. Stitt explained that CFNB's computer system had been crediting the Nichols' payments as though they had been paid on the due date. However, he insisted that because the loan was an Actual/365 loan the payments should have been allocated to interest gained between payment dates. The error, Stitt testified, created a net *benefit* to the Nichols of $230.00.

The district court adopted CFNB's assertions that changing the payment allocation method was required because the loan was an Actual/365 loan. The court noted that the 365/365 and 360/360 terms are defined by the UCCC. The UCCC provides:

> "(2) The finance charge on a consumer loan or consumer credit sale shall be computed in accordance with the actuarial method using either the 365/365 method or, if the consumer agrees in writing, the 360/360 method:
>
> (a) The 365/365 method means a method of calculating the finance charge whereby the contract rate is divided by 365 and the resulting daily rate is multiplied by the outstanding principal amount and the actual number of days in the computational period.
>
> (b) The 360/360 method means a method of calculating the finance charge whereby the contract rate is divided by 360 and the resulting daily rate is multiplied by the outstanding principal amount and the number of assumed days in the computational period. For the purposes of this subsection, a creditor may assume that a month has 30 days, regardless of the actual number of days in the month." K.S.A. 16a-2-103(2).

The district court continued to hold that "the computation of interest by this method is neither a breach of contract nor contrary to law. Similarly, Defendants fail to establish

15

how treatment in accordance with the terms of the contract regarding daily accrual increases the effective interest rate."

*Breach of Contract*

The Nichols argue that "Actual/365" only refers to the number of days interest is charged in a calendar year, not the method in which a consumer's payments are applied. They assert that the contract is ambiguous as to how their payments should have been applied. They ask this court to reverse the district court's finding that the contract was not ambiguous and to remand the case to the district court for a factual determination of what the parties actually agreed to with the aid of parol evidence.

The appellate court exercises unlimited review over the interpretation and legal effect of written instruments, and the appellate court is not bound by the lower court's interpretation of those instruments. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). The question of whether a written instrument is ambiguous is a question of law subject to de novo review. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013).

A contract "is ambiguous when the application of pertinent rules of interpretation to the whole 'fails to make certain which one of two or more meanings is conveyed by the words employed by the parties. [Citations omitted.]'" *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 245, 201 P.3d 680 (2009) (quoting *Wood v. Hatcher*, 199 Kan. 238, 242, 428 P.2d 799 [1967]).

The Nichols have a persuasive argument that the contract is ambiguous. While the loans clearly provide for interest to accrue on a 365/365 basis, they are silent as to how payments should be applied. The UCCC provision cited by the district court, K.S.A. 16a-2-103(2)(a), does not support its holding. This statute defines how interest is calculated

16

using the 365/365 method. While the definition refers to a "computational period," it does not specify whether the computational period is from payment date to payment date or bill date to bill date. See K.S.A. 16a-2-103(2)(a).

The Nichols assert that the contract provided for payments to be applied to interest accumulated between bill dates, and CFNB asserts that the contract provided for payments to be applied to interest accumulated between payment dates. It is not possible to tell from the face of the contract which party is correct. Therefore, the district court erred in finding that the contract was not ambiguous.

While the district court erred, this error is harmless in light of the district court's award. Using the payment date to payment date method, CFNB provided evidence that the Nichols owed $38,028.01 in principal and interest as of August 30, 2016. If it had used the bill date to bill date method as requested by the Nichols, the Nichols would have owed $37,648.04 on that date. Thus, if the Nichols are correct regarding the payment allocation method it would appear that they suffered damages in the amount of $379.97. However, the district court adopted the trial master's findings. The trial master found that the Nichols owed $37,330.96 as of August 30, 2016, and the district court entered judgment in favor of CFNB for that amount. Thus, the amount the Nichols were ultimately ordered to pay was less than the amount they would have paid had their payment been applied on a bill date to bill date basis. For this reason, it is unnecessary to remand the case for determination of this issue.

*Fraud*

The Nichols also assert that CFNB committed fraud or fraud by silence when it changed the way it applied the payments. Both of these claims require the Nichols to prove damages. See *Kelly v. VinZant*, 287 Kan. 509, 515, 197 P.3d 803 (2008) (listing elements of fraud); *Stechschulte v. Jennings*, 297 Kan. 2, 21, 298 P.3d 1083 (2013)

17

(listing elements of fraud by silence). For the reason discussed above, the district court's award negated any damages the Nichols may have incurred, so this claim also fails.

*The district court did not err in holding that CFNB did not commit fraud or violate the UCCC in applying the Nichols' $370.20 credit.*

The Nichols assert that CFNB committed fraud and violated the UCCC in the way it handled the $370.20 credit that CFNB awarded the Nichols after lowering the interest rate. They assert that CFNB misrepresented to them that they only needed to pay $69.00 for their January 2011 payment. The Nichols cite testimony from Terrill and Stitt that the $370.20 credit was supposed to be applied in January 2011 but was not applied until February 2011. This, the Nichols argue, "resulted in a full month of unpaid interest to accrue between January 15, 2011 (the due date), and February 14, 2011." They assert that interest would not have accrued on the loan if they had made a January payment, and that by paying in February their payment went to interest instead of reducing the principal.

"The existence of fraud is normally a question of fact. Therefore, upon appeal, our standard of review is limited to determining whether the district court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law." *Waxse v. Reserve Life Ins. Co.*, 248 Kan. 582, 586, 809 P.2d 533 (1991). Fraud must be proven by clear and convincing evidence. 248 Kan. at 586.

The Supreme Court has enumerated the elements necessary to establish a claim of fraud.

> "(1) [F]alse statements were made as a statement of existing and material fact; (2) the representations were known to be false by the party making them or were recklessly made without knowledge concerning them; (3) the representations were intentionally

18

made for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations made; and (5) the other party sustained damage by relying upon them." *Kelly*, 287 Kan. at 515.

The Nichols do not perform an element-based analysis of this issue. It appears that they are alleging that CFNB made a false representation when it said it would apply the $370.20 credit to the Nichols' January 2011 payment. CFNB knew that this representation was false, and it made the representation intentionally to induce the Nichols not to pay their full January 2011 payment. The Nichols did not make a full January payment in reliance upon the representation. And, they were damaged because CFNB's failure to apply the credit to the January 2011 payment caused interest to accrue between January 15 and February 14, 2011.

But the Nichols' assertions are unsupported by the record. The billing records show that the Nichols owed $224.02 in interest for the January bill, which reflected interest gained between December 15, 2010, and January 15, 2011. Between January 16, 2011, and February 14, 2011, the Nichols accrued an additional $216.41 in interest. This led to a total interest charge of $440.43 on the February 2011 bill. CFNB subtracted $69.00 from the interest charge due to an unrelated error, leaving an interest charge of $371.43. Finally, CFNB applied the $370.20 credit to the bill, leaving a total of $1.23 interest due between December 15, 2010, and February 14, 2011.

If CFNB had applied the credit in January instead of February, the same result would have occurred. The Nichols owed $224.02 in interest gained between December 15, 2010, and January 15, 2011. Because the $370.20 credit was due to interest overpayment, it was only applied to interest. Had CFNB applied the credit to the January 2011 bill as the Nichols insist they should have, the Nichols would have had a $146.18 credit remaining for their February bill. Contrary to the Nichols' assertion, the principal would have continued to gain interest every day because the loan is an Actual/365 loan.

19

Thus, they still would have gained $216.41 in interest between January 16, 2011, and February 14, 2011. Applying the $69.00 credit for bank error and the remaining $146.18 credit for the changing interest rate would have left the Nichols owing $1.23. This is exactly the same amount that they owed when the bank credited their account in February 2011.

The district court held that if the Nichols "would have made their February 15, 2011 payment on time, [the Nichols] would have had exactly the same principal balance as if all of the payments had been reversed manually and reapplied at the 6.25% rate." There is substantial competent evidence in the record to support this assertion. The Nichols provided no evidence, and certainly not clear and convincing evidence, to contradict this conclusion either at trial or on appeal.

The Nichols' UCCC argument is premised on the same idea—that CFNB violated the law by representing to the Nichols that it would apply the credit to their January 2011 payment. They rely on K.S.A. 16a-2-104(1), which provides: "[a] creditor shall credit a payment to the consumer's account on the date of receipt, except when a delay in crediting does not result in a finance charge or other charge." The Nichols argue that because CFNB did not credit the payment in January 2011, it allowed interest to accrue from January 15 to February 14, 2011. This claim fails for the same reason that the Nichols' fraud claim fails—CFNB did apply the credit to the Nichols' January 2011 interest, and because the loan was an Actual/365 loan, interest would have accrued between January 15 and February 14 regardless of when CFNB applied the credit to the Nichols' account. Because the delay did not result in a finance charge or other charge, CFNB did not violate the UCCC.

20

*The district court did not err in finding that CFNB did not violate the UCCC based on its charge of late fees.*

The Nichols next argue that "[t]he district court misinterpreted Kansas law in finding that [CFNB] did not violate the UCCC when it charged improper late fees—despite [CFNB]'s explicit admissions that it charged late fees improperly." There are two late fees at issue:  a $16.68 late fee charged in December 2010 which should have only been $15.43, and a $15.43 fee assessed in May 2012.

Interpretation of a statute presents a question of law, and this court exercises unlimited review over it. *Foster v. Kansas Dept. of Revenue*, 281 Kan. 368, 374, 130 P.3d 560 (2006).

The Nichols assert that CFNB violated K.S.A. 16a-2-502. The relevant section of this statute provides:  "The parties to a consumer credit transaction may contract for a delinquency charge on any installment not paid in full within 10 days after its scheduled or deferred due date in an amount not exceeding 5% of the unpaid amount of the installment or $25, whichever is less." K.S.A. 16a-2-502(1). CFNB complied with this statute. The terms of both the 2010 Loan and the 2012 Loan provide for a late charge of 5% of the unpaid amount, up to a maximum of $25.00, to be assessed on the portion of any payment made more than 15 days after it is due. Thus, CFNB complied with K.S.A. 16a-2-502(1).

The Nichols also allege that the district court misapplied the remedies available in the UCCC. First, they cite K.S.A. 16a-5-201(4). This section provides:

> "If a creditor has contracted for or received a charge in excess of that allowed by
> this act, or if a consumer is entitled to a refund and a person liable to the consumer
> refuses to make a refund within a reasonable time after demand, the consumer may

21

recover from the creditor or the person liable in an action other than a class action a penalty in an amount determined by the court not less than $100 or more than $1,000." K.S.A. 16a-5-201(4).

They also cite K.S.A. 16a-5-201(3), which provides that "[a] consumer is not obligated to pay a charge in excess of that allowed by this act, and if the consumer has paid an excess charge the consumer has a right to a refund of twice the excess charge."

While it is true that CFNB erroneously charged the Nichols a late fee in excess of that allowed for by the UCCC, that does not necessarily mean that the Nichols are entitled to the remedies therein. The UCCC also provides:

"If a creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error of law or fact notwithstanding the maintenance of procedures reasonably adapted to avoid any such violation or error, no liability is imposed under subsections (1), (2), and (3), the validity of the transaction is not affected, and no liability is imposed under subsection (4) except for refusal to make a refund." K.S.A. 16a-5-201(7).

CFNB established by a preponderance of the evidence that the excess late fee violations were unintentional.

The first late fee at issue is a $16.68 late fee charged in December 2010. The fee should only have been $15.43, which means the Nichols were overcharged by $1.25. The district court found that this error was inadvertent. The error occurred when CFNB was recalculating the amounts due under the new 6.25% interest rate. The Nichols do not cite anything to controvert the district court's finding. Because the error was unintentional, the remedies of the UCCC do not apply. See K.S.A. 16a-5-201(7).

22

The second overcharge occurred in May 2012. This was at the very beginning of the deferral period. The late fee was charged because the deferral agreement was not processed until the 16th day after the bill was due. This too is an unintentional error, and CFNB should not be penalized under the UCCC because of it. Ultimately, CFNB waived two late fees that it could have charged (totaling $30.86) to make up for its mistakes. This resulted in a net benefit to the Nichols of $14.18.

CFNB showed that the improper late fees were unintentional errors. It accounted for the mistakes by waiving late fees that it could have charged. Thus, the district court did not err in holding that the Nichols could not recover damages under the UCCC for the assessment of improper late fees.

*CFNB did not breach the deferral agreement by allowing interest to accrue during the deferral period.*

The Nichols allege that CFNB violated the terms of the deferral agreement by allowing interest to accrue during the time that payments were deferred.

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.'" *Stechschulte*, 297 Kan. at 15. The appellate court exercises unlimited review over the interpretation and legal effect of written instruments, and the appellate court is not bound by the lower court's interpretation of those instruments. *Prairie Land Elec. Co-op*, 299 Kan. at 366.

In this case, the district court correctly interpreted the deferral agreement. It held:

"The Agreements on their face plainly state that they do not alter the original notes or agreements, and that the Bank is deferring payments, not that it was forgiving interest. As

23

a result, the extension agreements extended the payments, but did not alter the note terms regarding daily accrual and did not extend interest during the deferral periods."

A review of the record shows that the district court was correct. The deferral agreements state that they are extending the due dates of certain payments. They specify that "[e]xcept as specifically amended by this agreement, all other terms of the original obligation remain in effect." This includes the interest accrual terms.

Furthermore, CFNB agreed to waive all of the interest accumulated during the deferral period. Because of this, the district court held that the issue was moot. The Nichols do not challenge the district court's mootness determination. When a district court provides alternative bases to support its ultimate ruling on an issue and an appellant fails to challenge the validity of both alternative bases on appeal, an appellate court may decline to address the appellant's challenge to the district court's ruling. See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 280, 225 P.3d 707 (2010).

In their reply brief, the Nichols make a different argument. There, they assert that they are not arguing that interest should not have accrued during the deferral period, only that the interest should not have been made due at the end of the deferral period. However, the district court's mootness ruling, which the Nichols do not challenge on appeal, disposes of this issue. For that reason, the district court did not err in denying the Nichols' claims regarding the deferral agreements.

*The district court did not err in holding that CFNB did not act illegally in applying the Nichols' April 2014 payment.*

Finally, the Nichols argue that CFNB's application of their $5,855.94 payment on April 2, 2014, violated the KCPA and the UCCC and resulted in fraud.

"The existence of fraud is normally a question of fact. Therefore, upon appeal, our standard of review is limited to determining whether the district court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law." *Waxse*, 248 Kan. at 586. Fraud must be proven by clear and convincing evidence. 248 Kan. at 586.

Again, our Supreme Court has enumerated the elements necessary to establish a claim of fraud.

> "(1) [F]alse statements were made as a statement of existing and material fact; (2) the representations were known to be false by the party making them or were recklessly made without knowledge concerning them; (3) the representations were intentionally made for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations made; and (5) the other party sustained damage by relying upon them." *Kelly*, 287 Kan. at 515.

In ruling on this issue, the district court focused on the fifth element of fraud: damages. The court held that CFNB's allocation of the payment in a manner different than the Nichols directed did not harm the Nichols. This is because CFNB had accelerated the loans and made a demand for payment prior to the Nichols' April 2, 2014 payment. The court noted that the Nichols "plainly did not submit funds sufficient to satisfy all of these claims . . . . Since these obligations were due and not contested by the [Nichols] as valid obligation, application of the payment in this manner caused no harm."

The Nichols disagree with the court's holding. They assert that the manner in which CFNB applied the payment "resulted in [CFNB] demanding over $700 in additional payment, and led to the foreclosure of [the Nichols'] homes." While the Nichols briefly address the damages element of fraud, they do not address the other elements. However, because this issue can be decided under the damages element alone, it is unnecessary to explore the other elements of the Nichols' fraud claim.

25

Generally, "a debtor who owes two or more accounts to a creditor may direct to which account any money which he voluntarily pays shall be applied." *Lumber Co. v. Workman*, 105 Kan. 505, 509, 185 P. 288 (1919). Assuming without deciding that the rule applies in this case and that CFNB violated the rule, the district court's holding regarding damages is still supported by substantial competent evidence. CFNB's attorneys sent the Nichols a letter on March 24, 2014, stating that CFNB had accelerated both loans and begun the foreclosure process. To accelerate a loan means "[t]he advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately." Black's Law Dictionary 14 (10th ed. 2014). At that time, the Nichols owed $33,359.40 on the 2010 Loan and $37,273.39 on the 2012 Loan. Even if CFNB had allocated the payments exactly as Kurtis directed, they still would have been tens of thousands of dollars short of satisfying their debt. The March 24, 2014 letter stated that CFNB directed its attorneys to file a lawsuit to collect the Nichols' debts and to foreclose the real estate mortgages. CFNB's application of the April 2, 2014 payment is not what led to the foreclosure of the Nichols homes—their failure to make timely, complete payments on the loans led to foreclosure of their homes.

The Nichols also claim that CFNB's allocation of the payments violated the UCCC. First, they allege a violation of K.S.A. 16a-3-205 by failing to provide them with accurate receipts of the $5,855.94 in payments. This provision of the UCCC provides that "[t]he creditor shall deliver or mail to the consumer, without request, a written receipt for each payment by coin or currency on an obligation pursuant to a consumer credit transaction." K.S.A. 16a-3-205(1). The district court held that the bank teller did provide the Nichols with receipts. This is supported by substantial competent evidence, as the receipts are part of the record on appeal. The district court went on to explain that the Nichols' complaint was not that they did not get a receipt, but that CFNB later applied the funds differently than the Nichols believed they would be applied.

The Nichols assert that "receipts provided by the creditor should *accurately reflect* the amount(s) paid and the account(s) those payments are applied to." However, the statute does not say this. It simply says that the creditor must give the consumer a written receipt for each cash payment made on an obligation pursuant to a consumer credit transaction. K.S.A. 16a-3-205. It does not state that there is a penalty for error in the receipt. And, it does not state that the receipt must show exactly how payments are applied. Even if it did, the April 8, 2014 letter provided the Nichols with a written receipt showing how the money was apportioned to their various obligations. Furthermore, even if CFNB failed to provide an accurate receipt, the Nichols fail to cite a provision of the UCCC which would enable them to recover damages for the miscommunication.

Finally, the Nichols allege that CFNB violated K.S.A. 16a-2-502(5). This section provides: "For delinquency charge purposes, a payment made prior to the due date of the next installment payment shall be applied to the previous installment. For all other purposes, payments are applied to installments in the order in which they fall due." K.S.A. 16a-2-502(5). The Nichols conclusively assert that this language prohibits CFNB from collecting late fees until all missed payments are made. Due to the conclusory nature of their argument, it is difficult to comprehend how the Nichols believe that CFNB violated this statute. Furthermore, the Nichols' argument is contradicted by another provision in the statute. This provision states: "A delinquency charge may be collected only once on an installment however long it remains in default. A delinquency charge may be collected at the time it accrues or at any time thereafter." K.S.A. 16a-2-502(3).

In response to the Nichols' argument on this point, the district court held that the purpose of this statute is to "ensure that the non-payment of a delinquency fee in a late payment is not the means to add another delinquency fee on the account." This holding is supported by the text of the statute, and the comments accompanying it. See K.S.A. 16a-2-502, cmt. 2 (stating this section is aimed at preventing the practices of assessing "multiple delinquency charges stemming from a single delayed payment"). The Nichols

27

do not allege that CFNB engaged in the prohibited practice of assessing multiple late fees for a single instance of failing to make a timely payment. Thus, their claim of error under K.S.A. 16a-2-502 must fail.

In sum, we find that the district court did not commit any reversible error in its holdings in this case.

Affirmed.